103 So.2d 215 (1958)
Marguerite MYERS, Appellant,
v.
Richard P. KORBLY, Appellee.
No. 295.
District Court of Appeal of Florida. Second District.
April 23, 1958.
Rehearing Denied June 12, 1958.
*216 Shackleford, Farrior, Shannon & Stallings, Norman Stallings, James E. Lehan, Tampa, for appellant.
Branch & Goff, Mabry, Reaves, Carlton, Fields & Ward, Edward B. Rood and J.A. McClain, Jr., Tampa, for appellee.
ALLEN, Judge.
This is an appeal from a final judgment, dated April 3, 1957, entered after a jury verdict for plaintiff in a negligence action brought by Richard P. Korbly against Marguerite Myers. The cause arose from an accident occurring when defendant's automobile, driven by her minor son, left a curve on Bayshore Boulevard in Tampa and struck two palm trees, demolishing the automobile and fatally injuring the 17 year old son of the plaintiff, who was a guest in defendant's automobile. Defendant appeals, the parties being referred to herein as they stood before the trial court.
The involved accident occurred between eleven and twelve P.M. on Saturday, March 17, 1956, at a curve on Bayshore Boulevard near Inman Avenue in Tampa. At that location, to the south, Bayshore is a one-way, three lane street. The speed limit was 40 miles per hour. The road surface was dry and the boulevard was well lighted. Defendant's son, who was 16 years of age and had an unrestricted license for only three weeks, was driving defendant's 1956 Ford Sedan southerly on Bayshore Boulevard. With him were five other youths. Plaintiff's son was riding in the front seat nearest the right front door and another boy was also on the front seat sitting between the plaintiff's son and the defendant's son, the driver of the involved automobile. The other three passengers rode in the back seat. The driver entered the boulevard after stopping at a traffic signal and then traveled in a southerly direction for two or three blocks. The car failed to negotiate a curve, after sliding 61 feet to the westerly curb of the roadway, left the boulevard, slid another 76 feet to a palm tree with which it collided, then slid another 61 feet to a second palm tree which was uprooted and broken in two about four feet from its roots.
We have not alluded to the speed of the automobile in the above paragraph, reserving such issue to a subsequent part of this opinion.
This action was brought under the guest statute and therefore, the evidence must be analyzed to determine whether the jury had sufficient evidence to find the defendant's son guilty of gross negligence which is necessary for actionable damages in a guest statute case.
We have examined the excellent briefs and appendices filed by the parties to this cause, and while not necessary, we deemed it advisable to study all the testimony taken before the trial judge to extract the evidence produced by the plaintiff to determine whether or not the jury, if it believed such testimony, could properly return a verdict in favor of the plaintiff on the issue of gross negligence.
J.R. Miller, a patrolman with the Traffic Bureau of the Tampa Police Department (R-24), testified that there were friction marks left by the car as it skidded sideways; and that there were 61 feet of friction marks in the street, an additional 76 *217 feet of friction marks to the first point of impact, and then an additional 61 feet to the point where the car struck the second tree, swung around it and came to rest. The witness identified a number of photographic exhibits, one of which showed the two trees struck by the car. He further testified that there was glass and some chrome from the car that was thrown 108 feet in a northwesterly direction from the final resting place of the car. He also testified that a friction mark is a mark left on a street from the wheels traveling in a sideways direction.
Another witness, William A. Raduns, who was with the defendant's son on the night of the accident in question and at the time of the accident (R-59), testified in part, as follows:
"Q. As you turned left from Bayshore, tell us from then on what happened? A. Well, I believe that we were going at a very high rate of speed down Bayshore. It just happened so quick, we didn't make the curve. We were going on so fast.
"Q. You mean it did not take you long to make the first curve. Did the car continue to pick up speed until you got there? A. Yes.
"Q. Was the radio on? A. Yes.
"Q. When you got to this curve, did you know you were not going to make it? A. Yes.
"Q. Why didn't you warn him? A. It happened so fast, I thought he would slow down but when we got there it was too late.
* * * * * *
"Q. Were you looking at the speedometer? A. No.
"Q. What were you doing? A. Just sitting there talking and the radio was going.
"Q. Have you driven in cars like this quite a bit? A. Yes, we have a Ford ourselves.
"Q. Bill, could you make an approximate estimate of the speed the car was going when you went into the curve? A. I could make an approximate estimate.
"Q. Would you tell us, in your opinion, what the speed was without looking at the speedometer? A. I could take a wild guess at about 80 miles an hour or so.
"Q. Eighty? A. That's just a wild guess.
"Q. Have you ever driven that fast before? A. Yes, sir."
After cross-examination, this witness for the plaintiff again testified (R-64):
"Q. But if you have to estimate it, and you admit it is an estimate, what would you say? A. It is just wild estimate, I took. As a wild guess, I would say 80.
"Q. You admit it is a wild guess. You didn't look at the speedometer at all? A. That's right.
"Q. Would you describe it as an average or a high rate of speed? A. A very high rate of speed."
James H. Campbell, Assistant Chief of Police of the City of Tampa, testified (R-76) that he was present and participated with Captain Dollar of the Miami Police Department on certain tests that were made on the Bayshore Boulevard at the place where the accident in question had occurred. He testified as follows:
"Q. When he was standing outside, would you tell us the speed on the speedometer as your car went around this curve in question? A. Mr. Rood, there were three different tests. In other words, you have 40 mile an hour *218 limit there. The first time I went I took it at 50, then 60, and then at 65.
"Q. So in this type of car, you made the curve at 65 miles an hour. Did you slip sideways any at 65 miles an hour? A. Yes, sir. There are three lanes there on Bayshore. There is one in the center that divides the other two. Coming into the curve at 65 miles an hour, I was hugging the one next to the island. The car would come out of that lane and almost into the curve before I could get it straightened up.
"Q. That is the way you drove it? A. That is the way the car would go at that speed. You couldn't hold it in that lane.
"Q. You made it at 65? A. Yes, by taking all three lanes.
"Q. You took all three, but there was no friction marks from it slipping sideways when you came back? A. No, although you could hear the tires sliding a little bit, you did not start to slide.
"Q. That's what I mean. The last experiment was at 65 miles an hour? A. Yes."
There was no cross-examination of Mr. Campbell.
Gene McPherson testified in favor of the defendant and stated that he was in the car at the time of the collision. On cross-examination by the plaintiff (R-110), he was asked the following questions and gave the following answers:
"Q. Mr. McPherson, could you estimate the speed at the time the car reached the curve? A. I couldn't say exactly anywhere around it, but I can tell you we were going over the speed limit, and that is for sure.
"Q. Over what? A. Anywhere around 60, and maybe over. I can't really tell you exactly what we were doing, because I was in the back. When you get around 60, you can't tell exactly how fast you are going.
"Q. Could you say how much over 60 you were going? A. I couldn't tell you.
"Q. When I was asking you if you knew how fast it was going, did you estimate two figures it was between? A. Yes, sir, I said between 60 and 100 miles, meaning I am not sure about any speed, but in between there.
"Q. Actually, all you can guess is that the speed was between 60 and 100. Is that the best you can do? A. I know it was somewhere around 60 or over. That is the best I can do. I can't tell you how fast we were going."
Plaintiff's exhibit No. 8 depicted Bayshore Boulevard at Inman Avenue showing the curved condition. Plaintiff's exhibit No. 10 showed the palm tree that the car of the defendant sheared off several feet from its base. Plaintiff's exhibits 3, 4 and 5 showed the automobile after the accident. Plaintiff's exhibits No. 2 and No. 17 showed the curves, contours, construction, etc., of Bayshore Boulevard.
We conclude that the foregoing evidence under the hereinafter cited cases sustains the jury's verdict.
The Supreme Court of Florida has held that excessive speed alone, without other factual evidence of negligence, is insufficient to sustain a complaint for gross negligence. Leslie v. West, Fla. 1949, 38 So.2d 821.
In the case of Faircloth v. Hill, Fla. 1956, 85 So.2d 870, 872, the Court said:
"We have held that all of the circumstances of each case entering into the particular happening must be considered in order to determine whether liability exists. See Dexter v. Green, Fla. 1951, 55 So.2d 548. In the same case we held that while each separate act involved in the drama might not in *219 and of itself establish gross negligence, nevertheless, the entire course of conduct of the automobile driver under all of the circumstances and in the light of all of the related factors taken collectively might well establish the existence of gross negligence by pointing to the conclusion that the driver of the car knew or should have known that his conduct placed others in danger of grave injury and that under all of the circumstances he could be found guilty of a conscious indifference for the safety of others."
In the case of Cadore v. Karp, Fla. 1957, 91 So.2d 806, 808, the Circuit Judge directed a verdict for the defendant, which on appeal was reversed. The Court held that in an action for death of guests in a head-on automobile collision on a bridge, the evidence on gross negligence was for the determination of the jury. The Court, in its opinion, said:
"From the testimony of Berg and the evidence of the skid marks and other physical facts, the jury had a right to infer that Karp was driving at a high rate of speed on the bridge. There is no evidence as to the condition of the brakes, and we do not think the jury was required to infer that they were defective, as the defendant-appellee would have us do. From Ennis' testimony, quoted above, the jury could have inferred that Karp suddenly jammed on brakes rather than applying them gradually. Ennis' testimony that he himself was going about 50 m.p.h. at the time of the accident and that Karp was following him throws little light, if any, on the question of the speed of the Karp car, in view of his testimony that he hadn't observed the Karp car for five or ten minutes prior to the time of the accident. A highway patrol officer testified that 45 m.p.h. was a reasonable rate of speed on the bridge.
* * * * * *
"We think that, in the circumstances here, the jury could have found that Mr. Karp failed to exercise that degree of `slight care' which is the equivalent of `gross negligence'. Faircloth v. Hill, supra. So it was error to withdraw the case from the jury and direct a verdict for the defendant, under the rule of Moore v. Dietrich, supra, 133 Fla. 809, 183 So. 2, cited above."
In the case of Madden v. Killinger, Fla. App. 1957, 97 So.2d 205, the District Court of Appeal of Florida, Third District, reversed a directed verdict for the defendant and held there was presented sufficient evidence to justify submission to the jury of the question as to whether or not the driver had been guilty of gross negligence. The facts as stated by the Court were substantially as follows:
The accident occurred on a clear dark night after the plaintiff and defendant had each consumed certain intoxicants. The defendant was driving the automobile, and as it traveled south, it approached a 90 degree curve that veered to the right. Both plaintiff and defendant had been over the route several times, and the defendant testified he knew there was a curve in the road. There was a dispute as to whether or not the plaintiff warned the defendant. The automobile did not negotiate the curve, but skidded off the roadway on the shoulder and struck a concrete pillar, knocked the pillar a distance of approximately 12 feet, careened off a distance of 27 feet, struck a similar concrete pillar, and finally came to rest upside down with the plaintiff pinned under the automobile. Approximately 50 feet of the steel link chain fence supported by the concrete pillars was torn up. The plaintiff testified that the automobile was being operated very fast. The defendant stated that his speed at the time of entering the curve was about 45 miles per hour and that he did not attempt to reduce his speed. The Court stated that two questions were necessary for a proper conclusion of the case. First, whether or not the evidence submitted by the appellant was *220 sufficient to go to the jury on the question of gross negligence, and second, whether or not the lower court erred in refusing to admit the proffered testimony of Captain Dollar, an expert witness relative to speeds and braking distances. The Court held that the facts were such that a jury could have reasonably concluded either that the defendant was guilty of gross negligence, or that defendant was not guilty; and that therefore, it was a question for the jury.
The following is the statement of the law found in 3 Fla.Jur., Automobiles, etc., § 123:
"While excessive speed alone or the mere violation of the statutory speed limits does not of itself constitute wilful and wanton misconduct or gross negligence within the meaning of the guest statute, excessive or unlawful speed coupled with other facts, such for example as driving at high speed through patches of fog in thick traffic just prior to a collision on a curve, failure to heed warning signs, or attempting to negotiate dangerous curves at high speed with full warning of their existence, driving while under the influence of intoxicants, driving an automobile equipped with smooth tires at a rapid rate of speed on a slippery highway, failing to notice a parked car ahead, or approaching at high speed a busy intersection where vision was obstructed, may be sufficient to establish such conduct or negligence."
The appellant's third point is as follows:
"Whether or not the speed estimate made by Delton T. Dollar was incompetent evidence."
It is somewhat similar to the third ground of the appellant's motion for a new trial, which is as follows:
"The Court erred in admitting into evidence, over the objection of the defendant, the testimony of the witness, Mr. Dollar, in that he was permitted to testify to a critical speed of 80.52 miles per hour on the curve."
Dollar had been offered as an expert witness by the plaintiff and as a basis for giving his evidence as an expert, he testified that he held the rank of Captain in the Miami Police Department and was director of training for the city's police academy; that he had attended for four and a half months the Northwestern University Traffic Institute in Traffic Police Administration; that this course included subjects dealing with physical laws and accident investigation to determine what happened prior to, during or after automobile collisions; and that necessary statistics were provided at Northwestern and tests conducted. Dollar further testified that he had conducted various experiments with various types of automobiles and on various surfaces to provide a backlog of statistical information; that he had available various machines to test the physical ability of a driver, including distance perception and brakes reaction, and machines for other forms of tests; and that he had personally conducted more than 6500 tests. He also testified that he had had experience in determining the coefficiency of friction. (R-65.)
The appellant vigorously and ably argues that Dollar was not qualified to testify as an expert under the circumstances of this case, or if he was so qualified, his testimony should not have been admitted because a proper predicate of his estimate of critical speed was totally lacking.
A trial judge is often confronted with the testimony of experts in various fields, and objections thereto, where much of the testimony relates to subject matter with which the trial judge, as well as the jury, is unfamiliar. Medicine, astral sciences, balistics, physics, chemistry, dynamics, and electricity are just a few of the topics in connection with which a witness must have a particular kind of background in order that the trial judge may properly determine *221 that he is an expert in his field and thus is entitled to testify as such.
Questions are frequently asked of a particular expert which are broader than the special field in which he is qualified, or his background from the tests which he has made may not actually be sufficient as a predicate for the question asked. However, unless sufficiently versed in the particular field of science, the trial judge often is unable to determine whether or not the question should be excluded. The tendency of the judge would be to permit the question and answer since, after all, the witness is the expert in the particular field and not the trial judge.
In the case before this Court, Dollar had testified as to what was the "critical speed" of a certain type automobile rounding the curve in question, which was based on a formula which Dollar used to determine the coefficient of friction.
Mr. Dollar was asked the following question and gave the following answer (R-67):
"Q. Tell the jury whether or not any of these tests were to determine the coefficient of friction, and what that means. A. If I may answer the last part first, the coefficient of friction is a drag factor or resistance offered with tires of a car sliding on the pavement. If we apply the coefficient of friction to an automobile, on the surface it is friction and the enumerator of friction would be that force necessary to impel the car at a constant speed. The denominator would be the weight of the car. By dividing the denominator into the enumerator we arrive almost always at a figure less than one and it would be expressed, or could be expressed as a decimal fraction. Only on special surfaces would the coefficient be greater than one."
Dollar was asked if he had made speed tests on the highway with a 1956 Victoria Fairlane of a total weight of 3432 pounds to determine what the critical speed would be that would cause the car to skid sideways at the spot that he examined. The defendant then made the following objection:
"Objection to any answer that the witness may give. I presume counsel for the plaintiff is going to ask him to give the speed. My objection to his giving the speed goes along with that. I will ask that the court withdraw the jury."
The court ordered the jury withdrawn, and after argument on the part of the parties, overruled the objection.
The witness then testified that the critical speed would be 80.52 miles per hour and he was then asked this question:
"Q. What does that mean, Captain? Explain to the jury what that means. It does not mean that he was going exactly that speed? A. No, sir, that is the critical speed, or the critical speed at which the car would begin to slip sideways.
"Q. How do you arrive at that? A. It can be found in any college physics book. * * *"
The witness was then asked where he would get the radius of the curve, and he implied it was shown on plaintiff's exhibit No. 1. He then testified:
"Q. Where do you get the coefficient of friction? A. I determine that with the tests I conducted."
Much more testimony was adduced by the plaintiff as to the type of tests that were made, and on cross-examination critical questions were directed at these tests.
The trial judge determined that the witness Dollar was qualified to testify as an expert, and we hold under the testimony in this case that the lower court was correct in so doing.
"The need for scientific or specialized knowledge to assist the court or *222 jury in deciding a case is becoming increasingly apparent. The untrained layman is unqualified to diagnose disease, and is still less able to form a sensible opinion as to the propriety of treatment thereof. Similarly, a jury of farmers is not capable of determining the value of a city lot; and such instances may be indefinitely multiplied. Witnesses possessing the required training or knowledge are called `expert' or `skilled' witnesses, and are permitted to testify as to their opinion on a matter in issue, and to give their reasons therefor." 13 Fla.Jur. Evidence § 309.
"When a witness is offered as an expert or skilled witness, it is for the trial court to determine whether or not he has been shown to possess the requisite qualifications and special knowledge to authorize his testimony." 13 Fla.Jur. Evidence § 311; Atlantic Coast Line R. Co. v. Crosby, 53 Fla. 400, 43 So. 318; Schley v. State, 48 Fla. 53, 37 So. 518.
"This is a question of fact to be determined from testimony bearing on that question and the decision of the trial court with respect thereto is conclusive unless it appears to have been in error." 13 Fla.Jur. Evidence § 311; Foster v. Thornton, 125 Fla. 699, 170 So. 459; Fred Howland, Inc., v. Morris, 143 Fla. 189, 196 So. 472, 128 A.L.R. 1013.
"Its decision is entitled to great weight in the appellate court because of the superior advantages possessed by the trial judge, who hears the testimony and observes the witnesses, and his decision will not be pronounced erroneous unless clearly so." 13 Fla.Jur. Evidence § 311; Davis v. State, 44 Fla. 32, 32 So. 822.
Dr. Wigmore, in Vol. II, Wigmore on Evidence, 3d Ed., Sec. 561, page 641, states with reference to the discretion of a trial court, that:
"* * * the trial court must be left to determine, absolutely and without review, the fact of possession of the required qualification by a particular witness. In most jurisdictions it is repeatedly declared that the decision upon the experiential qualifications of witnesses should be left to the determination of the trial Court."[1]
"Just how far this extends in each jurisdiction is difficult to say. In some, the ruling is not reviewable at all; in others, it is reviewable on certain conditions; in others, the matter is left `largely' to the trial Court's discretion. * * * in view of all these considerations, it cannot be doubted that the rule of the future ought to be: The experiential qualifications of a particular witness are invariably determined by the trial judge, and will not be reviewed on appeal."
Under footnote 1 above, the author lists the following Florida decisions:
Davis v. State, 44 Fla. 32, 32 So. 822; Schley v. State, 48 Fla. 53, 37 So. 518; Foster v. Thornton, 125 Fla. 699, 170 So. 459 (physician); Harvey v. State, 129 Fla. 289, 176 So. 439 (cattlemen).
Even though the court correctly held that Dollar could testify as an expert, it does not necessarily follow that he was qualified to give opinions with reference to all of the various factors involved in an automobile negligence case. He was questioned as to the critical speed at which a car of the type that was involved in this case would slip sideways in traveling around the curve at the point where the car left the street. A correct answer to this question involved a knowledge of physics, the working of a formula that would presuppose a knowledge of higher mathematics and some very precise information necessary as a predicate for the formula.
A study of a physics book now used at many universities, Physics by Hausmann & *223 Slack, divulges the following information that might be informative for an understanding of the equation problem given by Captain Dollar. In Chapter V, p. 86 it is stated:
"The surface of any solid if sufficiently magnified would be found rugged and uneven, and the irregularities cause it to oppose the sliding of another surface over it. This opposition is called sliding friction. A smooth (that is, frictionless) surface represents an ideal or limiting case which is never attained in practice. It must not be inferred that friction has no useful aspects; indeed a person could not walk nor a wheel roll on the ground without friction.
"It is found by experiment that the amount of friction depends upon the materials which are in contact, the condition of the sliding surfaces, and the force with which they are pressed together. Experiment also shows that the friction is virtually independent of the speed of sliding over a wide range of speeds, and that for any two given bodies, friction depends little, if any, upon the area of the sliding surfaces. As an illustration of the last-mentioned item, a slab of iron sliding along a wood plank will encounter practically the same friction when sliding on edge as when sliding on its face. The explanation probably lies in the fact that although there is less surface in contact when the slab is on edge, nevertheless, the whole weight of the slab is concentrated on this smaller surface, and the slab and plank are brought into more intimate contact. The amount of friction when a body is starting from rest is somewhat greater than while it is sliding, but for simplicity this effect will be neglected. The foregoing statements of experimental results are true only approximately even for dry surfaces.
* * * * * *
"When an automobile rounds a curve at constant speed, it is accelerating toward the center of the curve, and so the resultant force acting upon it must also have this direction. If the highway is level, the only way to get such a force is by means of friction between tires and roadway. In such a case, the central force is likely to be small and uncertain, and the curve must be rounded slowly to avoid skidding. To overcome this difficulty, it is usual to bank curves, by sloping the roadbed upward from the inner to the outer edge; when the angle of banking is correct, a car can round the curve safely at a higher speed without depending upon friction."
At the conclusion of this Chapter in Physics, from which the above quoted matter was obtained, there appears the two following problems:
"What is the highest speed at which a 3400-lb. automobile could travel around a curve of 400-ft. radius, if the roadway were level and if the coefficient of friction between the tires and the roadway were 0.125?"
"Compute the angle of banking of a curve 600 ft. in radius in order that traffic moving at 50 mi. per hr. may round the curve without depending upon friction."
The writer of this opinion seriously doubts that, were he the trial judge, he would have permitted the witness to state the "critical speed" of defendant's automobile. Sufficient predicate to show the witness correctly formularized the problem is sparsely shown in this record. However, it does not follow that we should reverse the trial judge. He was present, heard all the evidence and was in a better position to determine the question than a reviewing court.
Had the testimony of Dollar been the sole evidence from which the jury could have determined the relative speed of defendant's *224 car, we would hesitate to affirm the trial judge. Such is not the case. As we stated above, the jury had sufficient testimony before them, if believed, properly to render a verdict in favor of plaintiff without reference to Dollar's testimony. We cannot say that the trial judge's permitting Dollar to answer the question as to critical speed was prejudicial error.
The appellant's Point IV is as follows:
"Whether or not the trial court erred in rejecting defendant's instruction number 4 that excessive speed, misjudgment, or momentary lapse of the driver of the defendant's automobile would be insufficient to establish gross negligence and willful and wanton misconduct."
The requested instruction by the defendant was as follows:
"You are further instructed that although you may find that this accident was caused by excessive speed, misjudgment or from momentary lapse of the defendant in the operation of his car, yet this action, or failure of action on the part of the defendant, would not of itself constitute willful and wanton misconduct within the terms of the statute referred to, and if you do find that the proximate cause of the accident was excessive speed, misjudgment, or momentary lapse on the part of the defendant in the operation of his car, it will then be your duty to return a verdict for the defendant."
We have heretofore summarized many of the circumstances surrounding this unfortunate accident. Other factors, undisputed by the parties, were also before the trial court. Some of these were that the injury occurred in the nighttime while the car was rounding a curve, occurred while the driver had two other boys on the front seat with him, and occurred where the driver had very limited experience, having had an unrestricted license for only three weeks at the time of the accident. We are of the opinion that under all of the facts and circumstances above set forth, it was not error for the trial judge to refuse the requested instruction above quoted.
We conclude the lower court should be affirmed.
Affirmed.
KANNER, C.J., and SMITH, FRANK A., Associate Judge concur.