250 So.2d 311 (1971)
SEABOARD COAST LINE RAILROAD COMPANY, Appellant,
v.
Carolyn HILL, As Widow of Lester George Hill, Jr., Appellee.
No. 70-570.
District Court of Appeal of Florida, Fourth District.
June 21, 1971.
Rehearing Denied July 28, 1971.
*312 Manley P. Caldwell and Arthur E. Barrow of Caldwell, Pacetti, Barrow & Salisbury, Palm Beach, for appellant.
William S. Frates, II, of Beverly & Frates, West Palm Beach, for appellee.
REED, Judge.
On 8 April 1968 the plaintiff, as widow of the late Lester George Hill, Jr., filed a wrongful death action against the defendant Seaboard Coast Line Railroad Company alleging that the defendant had so negligently *313 operated a train through a highway crossing in the City of Clewiston, Florida, as to cause the vehicle operated by the plaintiff's deceased husband to run into and collide with the train. The defendant's answer denied that it was negligent and alleged contributory negligence of the plaintiff's decedent.
The evidence indicated that the plaintiff's decedent was traveling north on Francisco Street in Clewiston at about 1:55 a.m. on 18 May 1966 when he drove his vehicle into the side of defendant's train that was headed west and occupying a crossing that intersected Francisco Street. The defendant's vehicle impacted with the train at the coupling between a box car and a gondola. His death resulted from the accident.
On 30 April 1970 the jury returned a verdict finding the defendant guilty of negligence and assessed plaintiff's damages at $220,000.00. On 1 May 1970 the court rendered a final judgment pursuant to the jury verdict and the defendant appeals.
The defendant has raised seven points on appeal. We have reviewed each and believe them to be without merit. Points 1, 2, 4, and 7, however, warrant discussion.
Defendant's first point as stated in its brief is:
"Whether or not the trial judge erred in sustaining objections to testimony by Chief W.A. Whaley as to the speed of the vehicle at the time of the accident."
Chief W.A. Whaley of the Clewiston Police Department investigated the accident. He was called as a witness for the plaintiff. On cross-examination the defendant's attorney asked the chief's opinion as to the speed of the decedent's vehicle at the time of the accident. Objection was sustained. The defendant then proffered testimony from the chief which was actually given out of order in which the chief testified that in his opinion, based upon his inspection of the vehicle and the scene of the accident and his past experience in investigating impact accidents, that the speed of the decedent's vehicle was 45 to 50 miles per hour at the time of the accident.
Chief Whaley testified that he had been affiliated with the police department in Clewiston for a little over ten years and had been chief of the police for eight and one-half years. His background and training as a police officer included several sessions in training schools put on by the F.B.I. and a training program sponsored by the Traffic Court Conference at Avon Park. The chief also testified that he had investigated many accidents during his years as a police officer. However, he also testified that he was not a "traffic expert", although he had seen automobiles involved in accidents and inspected the amount of damage to such automobiles and compared it with the speed with which the automobiles had been going.
Because of the limited evidence of the chief's qualifications in the field of accident reconstruction and his own disclaimer of expertise, it is our opinion that the trial judge was perfectly within the realm of his discretion when he determined that the chief was not so skilled in determining the speed of a vehicle from its appearance and the physical evidence after impact that he qualified to give an opinion as to the decedent's speed at impact based on the appearance of the vehicle after the collision. See the case of Seaboard Air Line R. Co. v. Lake Region Packing Ass'n, Fla.App. 1968, 211 So.2d 25, 31, wherein we stated:
"* * * The determination of a witness' qualification to express an opinion  which would include an inquiry into and an evaluation of the basis of the witness' knowledge  is peculiarly a matter within the realm of the trial judge who should not be reversed in the absence of a clear showing of error."
The defendant's second point is:
"Did the trial judge err in determining that the condition of the crossing was *314 not a fact question for the jury to decide and allowing plaintiff's witness, Donald E. Wilcox, to testify that it was unsafe though he was not qualified and had never even seen the crossing?"
Under Point 2 the defendant contends that the trial judge committed error in allowing witness Donald E. Wilcox to testify that the crossing was unsafe. Mr. Wilcox is a professor of industrial engineering at the University of Florida.
A hypothetical question put to Professor Wilcox by the plaintiff sought an opinion, "* * * about the train involved in this case, as you know it to have been or as you know safety devises to have been either absent or present from the train." The witness answered that the train was unsafe  not the crossing as such.
After the foregoing question the witness was asked why he thought the train was unsafe. Over objection the witness answered that the crossing was dangerous because there were insufficient warnings to alert a driver approaching the crossing from the south and the lights in the background and the spaces between the railroad cars might have deluded the motorist. As we understand it, the sense of the witness' testimony is that the crossing was dangerous because it lacked adequate warning devices to have alerted a driver in the decedent's position. It seems to us that this was a conclusion as to a matter that was within the realm of a jury's ordinary experience and understanding. Therefore, the admission of this testimony was error, but in our opinion it was harmless because of the substantial non-opinion testimony in the records which would support a jury conclusion that the train on the crossing presented a dangerous condition. Such testimony will be discussed infra under our treatment of Point 4.
Defendant's Point 4 reads:
"Did the trial judge err in determining that an opinion as to what an average driver would have seen at the time and place of the accident was admissible and allowing Dr. Isadore Scherer, who had never seen the crossing or the decedent, to testify thereto?"
Dr. Isadore Scherer, also a plaintiff's witness, was asked on direct if he had an opinion as to whether an average driver would have seen the train standing on the crossing on the night of the collision. This question was preceded by a long series of assumptions which simply set out the facts surrounding the occurrence of the accident in a manner justified by the evidence. The question was later restated to solicit the doctor's opinion as to whether or not an average driver would have seen the train in time to have avoided the collision. The witness answered that an average driver would not have seen the train in time to have avoided a collision.
The appellant objected to the admission of this opinion on the ground that Dr. Scherer was not qualified as an expert on the subject, the testimony was an invasion of the province of the jury, and was irrelevant.
Considering the question of the qualifications of the witness, it appears from Dr. Sherer's testimony that he is a psychologist with considerable academic and practical experience. He testified that he had done research relating to motivation, attention and other variables in personal history which relate to a person's inability to work. He also stated that he had done research into the subject of the requisite knowledge and ability for the operation of machinery. On the basis of this testimony, we believe that the trial judge was within the realm of his discretion in determining Dr. Scherer was sufficently qualified as an expert or skilled witness to give a conclusion based on the facts set forth in the hypothetical. Seaboard Air Line R. Co. v. Lake Region Packing Association, supra.
The more difficult question is whether or not the subject matter of the *315 opinion was appropriate for opinion testimony. It is generally held that the subject matter of an opinion by an expert witness must be so related to some science, profession, business, or occupation as to be beyond the understanding of the average layman. See Mills v. Redwing Carriers, Inc., Fla.App. 1961, 127 So.2d 453.
The apparent subject matter of the witness' opinion was the visibility to an average driver of the defendant's train standing on the crossing on the night of the accident. At first glance it would appear that this would be a matter to be determined by the jury through the exercise of its common sense based upon the evidentiary facts. However, to fairly evaluate the subject matter of the opinion, we must examine the explanation given by the witness in support of the opinion. After having answered the question put to him in the manner indicated above, the witness explained that the reason he answered as he did was his understanding of the human reactions that would normally be engendered by the environment at the time of the accident as described in the hypothetical question. The witness testified that the darkness, the fog, the absence of flares, and the absence of sound would produce perceptional problems for a driver. The witness also testified that lights that were visible north of the crossing against a field of vision partially blocked by the box car would cause problems in depth perception. On the basis of these factors, the witness concluded that the information that could have been gathered as to the obstruction on the tracks was so poor that an average driver would not have been able to react to it properly. Hence, it appears to us that the subject matter of the opinion was not just the visibility of the train on the crossing, but also the deceptive quality of various factors that were present in the environment according to the hypothetical situation posed by the question, and the manner in which a person would react to these factors. The significance of and the reaction of a human being to these factors might reasonably be held to involve a knowledge that was within the sphere of the witness' expertise and beyond the scope of the common knowledge of the jurors. We, therefore, are of the view that the subject matter of the opinion was proper for the expression of an expert opinion.
The defendant's final objection to the testimony was that it was irrelevant. Presumably this is because the testimony was directed to the problems which an average driver would have encountered in seeing the standing train. In our opinion this does not rendered the testimony irrelevant, but relates basically to the weight to be given the testimony. See Mathews v. Carlson, Fla.App. 1961, 130 So.2d 625, wherein the Third District held that the trial court was in error in refusing to allow a traffic expert to testify for the plaintiff as to the average person's reaction time.
Finally, although we do not rest our conclusion on this, we consider the admission of the opinion, if it were error, to be harmless. Improper expert testimony may be considered harmless error where there is sufficient other evidence to justify the jury in reaching the conclusion supported by the opinion. See Mills v. Redwing Carriers, Inc., supra; Myers v. Korbly, Fla.App. 1958, 103 So.2d 215, 223; and Autrey v. Carroll, Fla. 1970, 240 So.2d 474.
In the present record there is an abundance of evidence from which the jury could have reached the ultimate conclusion supported by Dr. Scherer's opinion  that the plaintiff's decedent was not negligent in failing to see the standing train. This evidence is basically the same as that which formed the foundation for the hypothetical question. The following is a resume of such testimony.
1. Chief Whaley testified as follows: On the night in question at approximately *316 1:55 a.m., 18 May 1966, he was called to the scene of the accident. It was dark and there was patchy ground fog. There were no automatic signals at the crossing. The road had been resurfaced with black asphalt and the white road markings which indicated an oncoming railroad crossing had not been replaced. He determined that decedent had approached the crossing from the south going north. The nearest burning street light that was north of the crossing was about 300 feet away. After arriving at the accident, visibility conditions were such that he posted flashing lights at the crossing to prevent others from hitting the train. There were no gates, bells, flares or lights at the crossing. The crossing was marked by cross buck signs and round orange signs along the road. The box car was a dark red or red-brown and the gondola was black. They were hard to see from a distance over 35-40 feet. There was no illuminated paint or reflectors on the train. One could look north across the coupling and see the lights in downtown Clewiston and on U.S. 27. The speed limit on the south side of the track was 35 miles per hour.
2. Calvin Swindle, a deputy sheriff, arrived at the scene of the accident at about 2:00 a.m. He testified as follows: It was fairly dark with "thin" fog. There were no artificial lights illuminating the crossing. The train crew told him there had been no flagmen guarding the crossing and that the train was not blowing its whistle at the time of the accident, although the whistle had been blown prior thereto. The gap between the two railroad cars (one a box car and one a gondola) was right in the center of decedent Hill's lane of travel. Swindle walked back south 100 to 200 feet and looked back toward the train. The fog had become "real thick", and he could "hardly" see the train. The road was blacktop. The railroad cars were rusty-brown and looked dirty. There was no reflective paint or reflectors on the railroad cars.
3. John Pierce, a patrolman with the City of Clewiston on the night in question, testified as follows: He arrived on the scene at approximately 2:00 a.m. The train crew told him there had been no flagman or flares at the crossing when the accident occurred. They used a flashlight to get the wreckage away from the train because they could not see the wreckage in detail without flashlights. He took statements in the patrol car with the dome light on because he could not otherwise see to write. The railroad crossing was not illuminated by any type of light from the train. Coming toward the crossing from the south the visibility was nil. He had to ride with his foot poised over the brake because although he knew the accident was there he could not see it. He was 30-40 feet from the train before he could see it. There was patchy fog.
4. T.J. Carlton, the defendant's engineer in charge of the train on the night in question said the accident occurred at 1:55 a.m. The engine brakes had just been released and the locomotive, if it moved at all, moved only 6" to 8" prior to collision.
The defendant's Point 7 is:
"May the defendant in a wrongful death action present evidence as to the remarriage, prior to the trial of the case, of the plaintiff, who had been the widow of the person who was killed in the accident upon which the suit was based?"
In the present case the plaintiff remarried three times subsequent to the death of her first husband and prior to trial. Evidence relating to her remarriage was tendered, but objection thereto was sustained.
The only possible relevance of such evidence would be to the issue of damages. *317 When the damages available to a widow suing for the wrongful death of her husband are properly understood, it appears that evidence of remarriage is irrelevant. The wrongful death act, F.S. Section 768.02, F.S.A. 1969, provides, "* * * In every such action the jury shall give such damages as the party or parties entitled to sue may have sustained by reason of the death of the party killed * * *." (Emphasis added.) Under the statute and the case law interpreting it, the widow's recoverable damages are all losses occasioned by her husband's death. See Seaboard Air Line R. Co. v. Martin, Fla. 1952, 56 So.2d 509. It, therefore, follows that such damages are not subject to mitigation because their source is the husband's death. Although the hardship imposed upon the widow by her husband's death may be alleviated by a second marriage, the damages flowing from the death of the first husband are in nowise affected. Some support for this conclusion may be found in the case of Florida Cent. & P.R. Co. v. Foxworth, 1899, 41 Fla. 1, 25 So. 338, 348, wherein the Florida Supreme Court held that in estimating a widow's loss of society by reason of the wrongful death of her husband, a jury might consider all the evidence relating to the marital relationship at and prior to the time of death. Likewise, in estimating damages for the loss of support, the jury was held to be entitled to consider the decedent's past performance, conduct, health, and his future prospects  all as the same appeared at the time of his death.
The defendant cites in support of its contention the case of Florida Power & Light Company v. Bridgeman, 1938, 133 Fla. 195, 182 So. 911, 918. In that case a person who was an unmarried minor at the time of her parents' death was held entitled to maintain a wrongful death action based on the parents' death even though the child married after the parents' death, but before the suit was filed. The narrow holding of the court was that the status of the child for purposes of calculating its right to maintain the suit was determined as of the date of death. In dictum the court did state that the marriage of the child changed the quantum of damages. Because this comment was dictum and not based on facts similar to those now before the court we do not consider the case as controlling authority to support defendant's argument.
There is another rationale which would support the conclusion that the evidence of remarriage and the benefits flowing therefrom cannot be used to mitigate damages by reason of the wrongful death. In has been held in a number of Florida cases that a wrongdoer cannot diminish his damages by evidence of benefits flowing to the claimant from an independent collateral source. See for example Wadsworth v. Friend, Fla.App. 1967, 201 So.2d 641, wherein the Fourth District held that damages for wrongful death are based on pecuniary loss calculated as of the time of death and that evidence of the amount of funds received from a collateral source after the death of plaintiff's decedent was not admissible to mitigate damages claimed by plaintiff. In that particular case, the plaintiff was a forty-two-year-old woman dependent on her mother who was killed in an automobile accident with the defendant. After the mother's death, the plaintiff's estranged husband paid her $14,800.00 as a settlement in lieu of alimony. Evidence as to the amount of this settlement was held inadmissible for purposes of mitigating the plaintiff's damages for loss of her mother's support.
In O'Neal v. Ray, Fla.App. 1968, 213 So.2d 1, a wrongful death suit by minor children based upon the death of their father, it was held error to admit for purposes of mitigating damages, evidence of the fact that the minors received veteran's and social security benefits by reason of their father's death. See also Frazier v. Ewell Engineering and Contracting Co., Fla. 1952, *318 62 So.2d 51, wherein it was held that a widow's pension of $42.00 per month received on account of her husband's death was not deductible from the value of her lost support consequent on the death of her husband.
We conclude both on the basis of the nature of damages recoverable under the statute and the collateral source rule that evidence of a subsequent remarriage was inadmissible.
It is our view that the decision of this court passes on a question of great public interest, that question being:
"Whether or not, in a wrongful death action under Section 768.02, F.S. 1969, brought by one spouse to collect damages resulting from the wrongful death of the other spouse, evidence of plaintiff's remarriage is admissible to mitigate damages.",
and upon proper application we will so certify the decision.
The judgment appealed from is affirmed.
MAGER, J., concurs.
WALDEN, J., dissents, in part; concurs, in part, with opinion.
WALDEN, J., dissenting in part, and concurring, in part:
Believing that the trial court committed harmful and, therefore, reversible error in making the evidentiary rulings reflected in appellant's Points I, II and IV, I would reverse on these accounts.
I agree that Points III, V and VI are without merit.
I concur in the majority treatment of Point VII.