358 So.2d 836 (1978)
SEABOARD COAST LINE RAILROAD COMPANY, Appellant,
v.
Elliott BUCHMAN, as Administrator of the Estate of Andrea C. Buchman, Deceased, Appellee.
No. 77-365.
District Court of Appeal of Florida, Second District.
April 21, 1978.
As Modified On Denial of Rehearing May 19, 1978.
*837 George D. Lynn, Jr., and Stephen C. Chumbris of Harrison, Greene, Mann, Rowe, Stanton & Mastry, St. Petersburg, for appellant.
Robert Orseck of Podhurst, Orseck & Parks, P.A., Miami, and William Wagner of Wagner, Cunningham, Vaughan & Genders, P.A., Tampa, for appellee.
GRIMES, Judge.
The railroad appeals a final judgment for the plaintiff in a wrongful death action arising out of a crossing accident.
The accident occurred at the intersection of Twin Lakes Boulevard and the Seaboard Coast Line Railroad tracks in Hillsborough County. Twin Lakes Boulevard was a two-lane roadway running in a north/south direction. The road was 16 to 18 feet wide and was neither curbed nor marked with a center line. The Seaboard line consisted of a single set of railroad tracks running in an east/west direction. Approximately 900 feet east of the Twin Lakes crossing the tracks curved to the southeast. About 26 feet north of the railroad crossing, Twin Lakes Boulevard connected at a T-intersection with Busch Boulevard which ran in an east/west direction parallel to the railroad tracks.
There was a standard black and white crossbuck warning sign for northbound traffic located on the right side of Twin Lakes Boulevard 37 feet south of the northernmost rail of the tracks. A standard red and white stop sign stood on the right side of the road 29 1/2 feet south of the northernmost rail of the tracks. There were no signal lights or gates at the crossing.
The railroad right of way was 60 feet wide, 30 feet on each side of the center line of the tracks. There were no obstructions on the railroad right of way. However, there was a citrus grove to the southeast of the crossing and off the railroad right of way which obstructed the view of the track to the east for northbound vehicles until they were within 35 to 42 feet of the track.
The accident occurred about 11:50 a.m., April 15, 1975, in clear, sunny weather. The decedent was traveling north on Twin Lakes Boulevard in her Datsun sports car at approximately 15 to 20 miles per hour. She did not diminish her speed at any time from the time she passed the privately owned orange grove in the southeast quadrant of the crossing until the accident occurred. The speed limit on Twin Lakes Boulevard at this point was 30 miles per hour. When the accident occurred, the car radio was playing and the windows were closed. The train, consisting of a diesel locomotive and four passenger cars, was proceeding in a westerly direction from Tampa to St. Petersburg. As it rounded the curve east of the Twin Lakes crossing, it was traveling approximately 45 miles per hour. As it left the curve, the train accelerated and it was traveling at 50 miles per hour at the time of the collision. The speed limit for trains at the crossing was 59 miles per hour.
When the train was 100 to 140 feet from the crossing, the fireman saw the decedent's automobile traveling north on Twin Lakes Boulevard appear from behind the orange grove. Since it appeared that the car was not going to stop, the fireman immediately jumped out of his seat and put the train into an emergency stop. The emergency braking system worked properly, but the engine did not come to rest until it was approximately 1,209 feet west of the crossing. The train struck the right front door of the Datsun, killing the decedent.
The engine's headlamps were on at the time of the accident, and the train bell had been ringing continuously for three miles before the train reached the Twin Lakes crossing. The engineer and the fireman testified that the train began to blow its whistle at the whistle post designated for the crossing, and the whistle continued to blow in the standard sequence  two longs, a short, and a long  until the accident occurred. Two railroad employees who were driving on Busch Boulevard testified that they heard the whistle blowing as the train approached the crossing. Two train crewmen in the last car of the train and another person driving a truck on Busch Boulevard *838 said that they did not recall hearing the train whistle. An investigating patrolman testified that the wind at the accident scene was blowing toward the east at about 17 miles per hour.
The court denied the railroad's motion for directed verdict and submitted the case to the jury. On the basis of comparative negligence, the jury found that the plaintiff's decedent was 60% at fault and the railroad was 40% at fault. Accordingly, the court entered a final judgment for the plaintiff in the sum of $136,000.
The railroad first argues that it should have been granted a directed verdict. In response the plaintiff contends that a jury question was presented with respect to (1) the inadequate or untimely blowing of the train's whistle, (2) the excessive speed at the crossing under the circumstances, and (3) the absence of more adequate crossing protection in light of the train speed in question.
A leading case on the subject of train whistles is Tyus v. Apalachicola Northern Railroad, 130 So.2d 580 (Fla. 1961), in which the supreme court held that the testimony of a witness that he didn't hear the whistle blow presents a jury question on the negligence of the railroad for failing to blow the whistle if the witness' attention was directed to the point in issue. The language of Tyus is also susceptible to an interpretation that whenever negative testimony about the whistle is presented, a jury question always arises regarding whether the witness' attention was actually directed to the existence of the train and the possibility that the train would be blowing its whistle. However, we think the true application of the rule depends on whether there are facts from which the jury could reasonably infer that the witness in question had his attention directed to the matter of audible signals as the train approached the crossing. If so, the jury is entitled to decide if the witness was paying attention and to accord to his testimony the weight it may deem proper; if not, the testimony of the witness simply lacks probative value. See Seaboard Coast Line Railroad v. Helman, 330 So.2d 761 (Fla. 4th DCA 1976), reversed on other grounds, 349 So.2d 1187 (Fla. 1977).
In the case before us, there was no evidence from which the jury could infer that the attention of those witnesses who gave negative testimony about the whistle was directed to the matter of audible signals as the train approached. In fact, each of them specifically stated that they did not know whether the train blew its whistle because they were not paying attention.
Likewise, there was no basis upon which the jury could conclude that the train did not blow its whistle in a timely manner. The engineer and the fireman both testified that they began blowing the whistle at the whistle post located 1,261 feet east of the crossing. While two Seaboard men testified that whistle posts are usually placed about 1,500 feet from the crossing, there was no indication that this was required. Even at a speed of 50 miles per hour, if the train began to blow its whistle 1,261 feet from the crossing, the whistle would have been blowing for about 18 seconds before the accident. The fact that the whistle might have been blowing about three seconds longer had it commenced blowing at 1,500 feet could not be a basis for negligence.
The subject of train speed requires less discussion. Ordinarily, a jury question on negligence is presented when there is evidence that the train involved in a crossing accident was operating at a speed in excess of its speed limit. Helman v. Seaboard Coast Line Railroad, 349 So.2d 1187 (Fla. 1977); Martin v. Favorato, 79 So.2d 780 (Fla. 1955); Leslie v. Atlantic Coast Line Railroad, 103 So.2d 645 (Fla. 1st DCA 1958). However, no case has been cited for the proposition that a jury issue on train speed alone is presented when the evidence reflects, as in the instant case, that the train was operating within its speed limit. Of course, this does not mean that the speed of the train may not be a significant factor in those cases where there are no applicable train speed limits or where there are circumstances present which make the crossing particularly dangerous.
*839 On the question of adequate crossing protection, our supreme court, in Atlantic Coast Line R. v. Wallace, 61 Fla. 93, 54 So. 893 (1911), long ago held that the legislature rather than the jury must determine whether particular methods of crossing protection should be used in order to prevent an injury, but that it was the province of the jury in a crossing accident to determine whether the railroad exercised all of the care and diligence required by the circumstances of the particular case. This principle was more recently reaffirmed in McNulty v. Atlantic Coast Line Railroad, 198 So.2d 876 (Fla. 2d DCA 1966). Obviously, the railroad's failure to provide crossing protection according to a statutory mandate would be evidence of negligence. But are there circumstances under which the railroad may have to go further?
In Atlantic Coast Line R. v. Smith, 53 So.2d 301 (Fla. 1951), the railroad argued that it should have been granted a directed verdict because the evidence reflected that the speed of its train was under control and that the train was ringing its bell and sounding its whistle when the accident occurred in downtown Winter Haven. The court distinguished the cases upon which the railroad relied on the basis that they involved rural crossings rather than a crossing in the congested area of a fast growing municipality. In affirming a judgment for the plaintiff, the court observed:
It may not always be enough to blow the whistle and ring the bell, particularly is this true where the tracks of defendant are in a congested area where the vision is obstructed and various and sundry noises and other distractions are prevalent.
Id. at 302.
Florida East Coast Railway v. Soper, 146 So.2d 605 (Fla. 3d DCA 1962), involved an accident at a busy crossing in the City of Ft. Pierce. Visibility down the track was obstructed, and the crossing was marked by only the standard crossbuck warning sign. In affirming a jury verdict against the railroad, the court said:
The appellant contends that the trial court erred in failing to direct a verdict in its behalf since the evidence amply demonstrates full compliance with the law and, therefore, a total absence of negligence. This contention would merit serious consideration if the degree of care required of a railroad in a case such as this were fixed, requiring no more than audible and visual warnings and compliance with the laws relative to speed and erection of crossing signs. However, the degree of care is variable and dependent upon the circumstances of a particular case and the danger prevalent at a particular crossing... .
Id. at 607.
The same principles were applied by our court in Seaboard Air Line Railroad v. Hawes, 208 So.2d 634 (Fla. 2d DCA 1968). The accident in that case occurred at a crossing where the view up the track was obstructed by a tree and some buildings off the railroad right of way. However, the driver apparently did see the train before the accident occurred because he left skid marks of 150 feet up to the tracks. There was no indication that the train failed to sound its whistle and its bell or that it was proceeding in excess of the speed limit. The crossing protection consisted of the standard crossbuck and some yellow lines painted on the highway. Relying heavily on Atlantic Coast Line R. v. Smith, supra, this court affirmed a judgment for the plaintiff by stating:
We conclude that in this case there was a factual situation for the jury to determine; whether considering the location of the railroad, the obstruction of the view of the railroad from the highway, and whether better look-out protection should be afforded the traveling public. In other words, we conclude that this was a jury case and that there was sufficient evidence to support the jury's verdict.
Id. at 637.
From these and similar decisions, it appears that our courts have established a rule in railroad cases that where obstructed crossings in congested areas are involved, it *840 may not be enough for the railroad to protect its crossing with the standard crossbuck, to operate its train within the speed limit, and to blow the whistle and ring the bell. The jury is still permitted to determine whether the railroad exercised reasonable care and caution under the circumstances and conditions existing at the time of the accident. A directed verdict would only be appropriate in those cases in which there is no evidence of any specific acts of negligence and there is no evidence that the crossing is especially dangerous.
The following quotation from 65 Am.Jur.2d Railroads § 509 (1972), reflects the fact that other jurisdictions have reached similar conclusions:
Support is found in many decisions for the conclusion that where the crossing involved is, as it is frequently put, an "ordinary country crossing" and presents no features of unusual danger, compliance with statutory requirements as to the giving of warning signals measures the full duty of the railroad company, but where the crossing is, in view of the geographical configuration of the vicinity, the presence of obstructions to the view of the crossing by an approaching traveler, the amount of travel over the crossing, etc., extrahazardous, the giving of the statutory signals may not be sufficient, and the jury may be justified in finding that additional warning was required to discharge the obligation of the railroad to use reasonable care in view of all the circumstances... .
Applying these principles to the instant case, it is evident that the court properly denied the railroad's motion for directed verdict. While the subject crossing was about three miles beyond the city limits of Tampa, it was located in a congested area, and there was evidence from which the jury could infer that the crossing was frequently used. The decedent's view to the right was totally obscured until she was about 40 feet from the track. Therefore, assuming an undiminished speed of 15 miles per hour, she had an unobstructed view up the track for less than three seconds before the accident. Accordingly, whether the railroad should have provided additional crossing protection became a jury issue, and in deciding whether the railroad was negligent, the jury could properly consider the manner in which the train was being operated and all of the other circumstances surrounding the accident.
A further point on appeal involves the testimony of three expert witnesses presented by the plaintiff over the objection of the railroad. First, Frank Fowler, a human factors consultant, was allowed to give an opinion that there were a number of "confusion factors" at the crossing, such as, (1) the fact that Twin Lakes Boulevard intersected with a four-lane highway (Busch Boulevard) approximately 30 feet beyond (north of) the crossing; (2) the fact that the railroad crossing had a slight rise to it; (3) the fact that the view of an approaching northbound driver would be restricted by the orange grove to the right; and (4) the fact that the county stop sign did not indicate whether it applied to the railroad crossing or to the street intersection.
The second expert witness was Professor Norman Korobow, a human factors psychologist, who testified that 80% to 87% of the population would not have been able to hear the train whistle under the circumstances described in a hypothetical question which assumed facts in evidence concerning the accident. He indicated that he did not take visibility into consideration because he had concluded that due to the respective speeds of the train and the automobile the plaintiff's decedent could not have stopped short of the tracks when the train first came into view. His testimony did not suggest any consideration of the responsibility of motorists approaching marked railroad crossings to be alert and to listen for approaching trains.
The last expert was William Fogarty, a professor of civil engineering at the University of Miami. Professor Fogarty testified that in his opinion the crossing did not meet minimum design standards because the Florida Uniform Manual of Traffic Control *841 Devices did not expressly provide for the installation of stop signs at railroad crossings.
On the subject of the admissibility of opinion testimony by a traffic reconstruction expert concerning the cause of an automobile accident, the court in Smaglick v. Jersey Insurance Co. of New York, 209 So.2d 475 (Fla. 4th DCA 1968), said:
Expert opinions are admissible only when the facts to be determined are obscure and can be made clear only by the opinions of persons skilled in relation to the subject matter of the inquiry; and when facts are within the ordinary experience of the jury, conclusions therefrom will be left to them, and even experts are not permitted to give conclusions in such cases. (citations omitted)
Id. at 476.
In Seaboard Coast Line Railroad v. Hill, 250 So.2d 311 (Fla. 4th DCA 1971), the court, by a split decision, approved the admission of a psychologist's testimony that the deceptive quality of various factors in the environment affected the visibility of the defendant's standing train to the extent that the average driver in the shoes of the decedent would not have been able to react properly to avoid it. The court pointed out that the opinion of another expert witness that the railroad crossing was dangerous because it lacked sufficient warning devices to have alerted a driver in the decedent's position should not have been permitted, but concluded that the admission of that testimony was harmless error.
Several years later a different panel of the same court, in Seaboard Coast Line Railroad v. Kubalski, 323 So.2d 32 (Fla. 4th DCA 1975), held that it was reversible error to allow the president of a consulting engineer and safety consultant firm to give an opinion in response to a hypothetical question with respect to how an average automobile driver would react when he found himself approaching a railroad crossing in a line of traffic under the same circumstances as the plaintiff's decedent. The court concluded that the testimony improperly invaded the province of the jury to decide what a reasonable man should do or would do when faced with the instant situation. The court distinguished Hill on its facts by observing that the accident in Hill involved extraordinary circumstances.
As might be expected there are a number of cases from outside Florida on the general subject. The case of St. Louis Southwestern Railway v. Jackson, 242 Ark. 858, 416 S.W.2d 273 (1967), is of particular interest because many of the factors among those deemed to be within the comprehension of the average juror were present in the case below. In Jackson, the Arkansas Supreme Court said:
We hold that the trial court erred in admitting the expert testimony about the abnormally dangerous condition of the crossing. The facts submitted to the witness for the basis of his opinion were as follows:
1. The type of highway.
2. The speed of automobiles approaching the crossing.
3. The approach to the crossing  namely, a straight level highway running due east and west.
4. The advance warning signs.
5. The number of vehicles that daily cross the crossing.
6. The number of trains that pass the crossing daily.
7. The speed of the trains.
8. The angle of the approaches  namely, right angles.
9. Obstruction to vision of motorist.
10. Obstruction to vision of train crew.
11. Previous accidents that had occurred recently under similar conditions.
12. Distraction elements to motorists.
13. Railroad crossing signals.
14. The kind of day.
15. The position of the sun.
Not a single one of the foregoing facts taken individually is beyond the comprehension of the average juror; nor can we find any reason to say that an average juror would not be competent to determine from the facts when considered together whether the crossing was abnormally *842 dangerous. We have consistently held that it is prejudicial error to admit expert testimony on issues which could conveniently be demonstrated to the jury from which they could draw their own conclusions. See S & S Construction Co. v. Stacks, 241 Ark. 1096, 411 S.W.2d 508 (1967). Therefore we hold that the trial court committed reversible error in admitting the expert testimony on the abnormally dangerous crossing.
Id. at 280.
After a thorough review of the record in the instant case, we have concluded that the testimony of the plaintiff's experts referred to above had the effect of invading the province of the jury. The testimony was particularly prejudicial in this case because there was no independent evidence of specific acts of negligence. Expert testimony can be very helpful in explaining complicated subjects which are beyond the knowledge of the average juror. On the other hand, the practical effect of permitting an expert to testify is to advise the jury that this is a person whose opinion is worth considering. Therefore, allowing an expert to testify on matters of common knowledge creates the very real possibility that the jurors will be unduly influenced by the opinion of one whose advice was not needed by them to reach an intelligent conclusion.
All of the factors which Mr. Fowler said would cause confusion at this crossing were matters which could be readily appreciated by any person who drives an automobile. Counsel could have very properly pointed out the so-called "confusion factors" to the jury in his closing argument since they were predicated upon facts admitted into evidence. However, permitting Mr. Fowler to make the same observations effectively put the stamp of expertise upon an issue that the jury was fully competent to decide.
The testimony of Professor Korobow flies directly in the face of Kubalski. There are circumstances surrounding every railroad crossing accident which are peculiar unto themselves. However, unlike Hill, there were no "extraordinary" circumstances existent in this case which would warrant having a psychologist tell the jury that most people in the position of the decedent on the day of the accident would not have heard the whistle blowing.
The testimony of Professor Fogarty about the propriety of having a stop sign at the railroad tracks was inappropriate because this sign had been erected by the county rather than the railroad. Whether the presence of the sign was a factor which should have served as an additional warning to the decedent or whether it may have tended to confuse her were matters for the jury to decide.
The other points raised by the parties need not be discussed. The special verdict reflected total damages of $340,000 and the respective percentages of fault. No issue concerning compensatory damages was raised in this appeal. The judgment is reversed, and the case is remanded for a new trial only on the issue of liability.
HOBSON, Acting C.J., and DANAHY, J., concur.