**Damaris LIBOY, as Personal Representative of the Estate of Rolando Schalek LIBOY, Plaintiff,**

v.

**John A. ROGERO, as Personal Representative of the Estate of William Alan ROGERO, CSX Transportation, Inc., National Railroad Passenger Corporation, Kennon Taylor, Charles Smith, and Joepat LLC. Defendants.**

**No. 6:04–CV–30–ORL–31JGG.**

United States District Court, M.D. Florida, Orlando Division.

Feb. 22, 2005.

Jennifer K. Birmingham, Randall M. Bolinger, Alvarez, Sambol, Winthrop & Madson, P.A., Orlando, FL, for Beacon Electrical Contracting and Design, Inc., Defendant.

James Edward Cheek, III, Winderweedle, Haines, Ward & Woodman, P.A., Winter Park, FL, for Damaris Liboy, Plaintiff.

Daniel John Fleming, Melkus, Fleming & Gutierrez, P.L., Tampa, for CSX Transportation, Inc., National Railroad Passenger Corporation, Defendants.

Jose A. Gutierrez, Melkus, Fleming & Gutierrez, P.L., Tampa, FL, for CSX Transportation, Inc., National Railroad Passenger Corporation, Charles Smith, Kennon Taylor, Defendants.

David M. Rogero, David M. Rogero, P.A., Coral Gables, FL, for John A. Rogero, Defendant, Pro se.

Richard W. Smith, Fisher, Rushmer, Werrenrath, Orlando, FL, for Sheppard Electric Company, Defendant.

Gary D. Vasquez, Vasquez & Tosko, LLP, Orlando, FL, for Joepat, LLC, Defendant.

### ORDER

PRESNELL, District Judge.

This case is before the Court on Defendants CSX Transportation Inc.'s ("CSX"), National Railroad Passenger Corporation's ("Amtrak"), Kennon Taylor's, and Charles Smith's Motion for Summary Judgment (Doc. 72); Plaintiffs' Response (Doc. 98); and Defendants' Reply (Doc. 106).

## I. BACKGROUND

Shortly before 12:30 p.m. on July 1, 2002, Rolando Liboy died when the car in which he was a passenger collided with an Amtrak train. William Rogero, the driver of the car, died along with Liboy. The collision occurred in Pine Castle, Florida, as Liboy and Rogero were traveling westbound on Glen Rose Avenue through a railroad crossing ("the Glen Rose Crossing").

This case is a wrongful death action in which the Liboy Estate [1] has sued, among others; the Rogero Estate; the train operator, Amtrak; the Amtrak personnel operating the train, Kennon Taylor and Charles Smith; and the railroad owner, CSX. Orange County, Florida, the entity responsible for Glen Rose Avenue, has been dismissed from the case.

In its Amended Complaint (Doc. 31), the Liboy Estate alleges that the CSX, Amtrak, Taylor, and Smith (collectively, "the Rail Defendants") were negligent as follows in regard to Liboy's death:

- that CSX negligently failed to use an appropriate method of operation or to install adequate safety and warning devices that could have prevented the collision, (see id. ¶¶ 25–35);

- that Amtrak negligently operated, maintained, and controlled its train, so as to cause the collision to occur, (id. ¶ 44); and

- that Taylor and Smith negligently operated and maintained the train, so as to cause the collision to occur, (id. ¶ 77).

The Liboy Estate also alleges that the foregoing conduct was intentional or grossly negligent, such that punitive damages should be awarded. (See id. ¶¶ 39, 48, 81).

It is undisputed that the warnings in place at the Glen Rose Crossing were standard crossbucks, that is, signs configured as so—X—with the word "RAIL ROAD" printed along one cross bar and the word "CROSSING" printed along the other. Immediately before the collision, the train

---

1. Liboy's personal representative and beneficiaries are listed as Plaintiffs in this case; but, for simplicity, Plaintiffs will collectively be referred to as the Liboy Estate in this Order.

was traveling northbound at a speed equal to or less than 75 miles per hour; the train's horn first sounded at 812 feet from the Glen Rose Crossing; and, the train horn continuously sounded for the 2.5 seconds it took the train to travel the last 275 feet or so to the point of impact.

The dynamic variables, in this case, are the speed and position of Rogero's car in the seconds before the collision. Immediately before the collision, Rogero's car traversed a four lane highway and approached the Glen Rose Crossing. By all accounts, the car was faced westbound at the point of impact. Smith and Taylor, the Amtrak personnel in control of the train, recall that Rogero's car was moving through the Glen Rose Crossing at the point of impact. Taylor recalls applying the train's emergency brake somewhere in the vicinity of impact, when he realized that the car was proceeding to go through the Glen Rose Crossing. (Doc. 98, Attach. 1, at 20–21; *id.*, Attach. 2, at 17). Smith recalls that the car did not stop or slow down prior to impact. (Doc. 106, Attach. 2, at 55). The Liboy Estate's proffered expert witness assumes, in his accident analysis, that Rogero's car was traveling at about 20 miles per hour at the time of impact. (Doc. 98, Attach. 4, at 4). Nevertheless, a clerk in a convenience store, approximately 300 ft away and at an angle a few degrees northeast from the point of impact, recalls that her attention was drawn to the Glen Rose Crossing immediately before the collision, (*id.*, Attach. 5, at 13), and that it appeared, at that point, as if the car was stopped on the tracks, (*id.* at 9, 13, 23). The store clerk, however, has acknowledged that, from her vantage point (looking almost directly west toward the Glen Rose Crossing), she could not later distinguish a car stopped on the tracks from a car stopped before the tracks. (*Id.* at 9, 12).

The Rail Defendants have filed a motion for summary judgment on all of the Liboy Estate's claims. CSX contends that it is entitled to summary judgment because it has complied with all of Florida's Statutory requirements in regard to the Glen Rose Crossing. Amtrak and the Amtrak personnel contend that they are entitled to summary judgment because they were traveling within the appropriate speed limit, and Rogero's negligence was the sole cause of the collision. The Rail Defendants contend, furthermore, that the facts are insufficient to support the Liboy Estate's claims for punitive damages. In response, the Liboy Estate contends that, regardless of Rogero's negligence, if any, the Rail Defendants may still be held liable for certain negligent acts and omissions.

## II. STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Whether a fact is material depends on the substantive law of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof, that party must "go beyond the pleadings and by ... affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations and citation omitted). Summary judgment is mandated against the non-moving party who thereafter fails to designate evidence sufficient to establish a genuine issue of

fact for trial. *Id.* at 322, 324–25, 106 S.Ct. 2548.

In this review, the Court must consider all inferences drawn from the underlying facts in a light most favorable to the non-moving party, and resolve all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If an issue of material fact exists, the court must not decide it, but rather, must deny summary judgment and proceed to trial. *Environmental Def. Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981).[2]

### III. ANALYSIS

The Liboy Estate's claims fall into two general categories: (A) claims that CSX negligently maintained the Glen Rose Crossing; such that there was insufficient visual warning of the train's approach; and (B) claims that Amtrak and its personnel, Taylor and Smith, negligently operated the train, in that they failed to give adequate audible warning of the train's approach and failed, otherwise, to avoid the collision or to reduce its force. The Liboy Estate further contends that punitive damages are a jury issue under the circumstances.

### A. The Insufficient–Visual–Warning Claim Against CSX

■ The Liboy Estate's insufficient-visual-warning claim raises the issue of whether CSX may be held liable for failure to install certain warning devices at the Glen Rose Crossing. In that regard, Chapters 351 (entitled "Railroads"), 316 (entitled "State Uniform Traffic Control"),

and 335 (entitled "State Highway System") of the Florida Statutes provide a framework of obligations and immunity in regard to the installation of warning or protective devices at railroad crossings. These provisions make the Liboy Estate's claims against CSX untenable.

At the outset, Florida Statute Section 351.03, in relevant part, sets a base line:

(1) Every railroad company shall exercise reasonable care for the safety of motorists whenever its track crosses a highway and shall be responsible for erecting and maintaining crossbuck grade-crossing warning signs in accordance with the uniform system of traffic control devices adopted pursuant to s. 316.0745. Such crossbuck signs shall be erected and maintained at all public or private railroad-highway grade crossings.

(2) Advance railroad warning signs and pavement markings shall be installed and maintained at public railroad-highway grade crossings in accordance with the uniform system of traffic control devices by the governmental entity having jurisdiction over or maintenance responsibility for the highway or street …. [3]

FLA. STAT. § 351.03(1)-(2). The reference to "the uniform system of traffic control devices adopted pursuant to s. 316.0745" is a reference to the Federal Highway Administration ("FHA") Manual on Uniform Traffic Control Devices, 2003 Edition, ("MUTCD"). *See* FLA. STAT. § 316.0745(2); FLA. ADMIN. CODE r. 14–15.010 (2004).[4] In

---

**2.** All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**3.** The remainder of subsection (2) reads: "All persons approaching a railroad-highway grade crossing shall exercise reasonable care for their own safety and for the safety of railroad train crews as well as for the safety

of train or vehicle passengers." FLA. STAT. § 351.03(2).

**4.** The Liboy Estate had cited and thereby apparently concedes that the MUTCD's 2003 Edition is applicable, in spite of the fact that the collision occurred in July 2002. The Millennium (2000) Edition was in effect at the time of the collision and does not appear to

regard to crossbucks, the MUTCD provides: "As a minimum, one Crossbuck sign shall be used on each highway approach to every highway-rail grade crossing, alone or in combination with other traffic control devices." MUTCD § 8B.03, *available at http://mutcd.fhwa.dot.gov.* Accordingly, Section 351.03 allocates to railroad companies the responsibility to install and maintain the minimum, necessary traffic control device at public or private railroad-highway grade crossings. FLA. STAT. § 351.03(1).

Florida Statute Section 316.171 provides, in relevant part:

Every railroad company operating or leasing any track intersecting a public road at grade and upon which railroad trains are operated shall erect traffic control devices that are necessary to conform with the requirements of the uniform system of traffic control devices adopted pursuant to s. 316.0745. This section does not require the railroad company to erect those devices, such as pavement markings and advance warning signs, which are the responsibility of the governmental entity having jurisdiction over or maintenance responsibility for the public road. Any change in the design of a traffic control device in the uniform system of traffic control devices applies only at new installations and at locations where replacements of existing devices are being made.

Fla. Stat. § 316.171. As with Section 351.03, Section 316.171's reference to "the uniform system of traffic control devices adopted pursuant to s. 316.0745" is a reference to the MUTCD. In regard to the traffic control devices that are necessary to conform its requirements, the MUTCD provides a host of technical specifications and, in its introduction, that "[t]he highway agency or authority with jurisdiction and the regulatory agency with statutory authority, if applicable, jointly determine the need and selection of devices at a highway-rail grade crossing." MUTCD § 8A.01.

Florida Statute Section 335.141 further provides, in relevant part:

(1)(a) The [Florida Department of Transportation] shall have regulatory authority over all public railroad-highway grade crossings in the state . . .

(b) A "public railroad-highway grade crossing" is a location at which a railroad track is crossed at grade by a public road.

(2)(a) The department, in cooperation with the several railroad companies operating in the state, shall develop and adopt a program for the expenditure of funds available for the construction of projects for the reduction of the hazards at public railroad-highway grade crossings. The department and the railroad companies are not liable for any action or omission in the development of such program or for the priority given to any crossing improvement.

(b) Every railroad company maintaining a public railroad-highway grade crossing shall, upon reasonable notice from the department, install, maintain, and operate at such crossing traffic control devices to provide motorists with warning of the approach of trains. The department shall base its notice on its adopted program for the reduction of hazards at such crossings and on construction efficiency considerations relating to the geographical proximity of crossings included in such program. The design of the traffic control devices must be approved by the department, and the cost of their purchase and installation must be paid from the funds described in paragraph (a).

differ from the 2003 Edition in any respect material to this case.

Fla. Stat. § 335.141(1)-(2)(b). Section 335.141 clearly contemplates the development and adoption of a program funded, at least in part, by government entities and intended to reduce traffic hazards at railroad-highway grade crossings. Indeed, that program is related to a broader, federally-funded initiative, which provides that "[e]ach state shall conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require . . . protective devices, and establish and implement a schedule of projects for this purpose."[5] 23 U.S.C. § 103(d); see FLA. ADMIN. CODE 14-46.002 (1982).[6] Furthermore, Section 335.141 clearly provides, in regard to the program, that the Florida Department of Transportation and railroad companies cannot be held liable for the priority given to installing any crossing improvement. FLA. STAT. § 335.141(2)(a).

In the instant case, the Glen Rose Crossing is a location at which a CSX railroad crosses at grade a public road, Glen Rose Avenue. (See Doc. 72, Attach. 1, at 5–9).[7] It is clear that, according to Section 351.03, CSX had a duty to maintain crossbucks at the Glen Rose Crossing. The Liboy Estate does not contest that crossbucks were present. Rather, the Liboy Estate contends that CSX had a duty to install better warning devices and argues that Florida law presents no legal impediment to such a claim.

While it is true, as the Liboy Estate points out, that state courts as well as a federal court, in Smith v. CSX Transportation, Inc., 805 F.Supp. 37 (M.D.Fla.1992), have permitted such claims to proceed against railroad companies, that point is to no avail. A significant change has occurred. Florida law now looks to the MUTCD as a guide to implementing traffic-control devices at railroad-highway grade crossings, FLA. STAT. §§ 351.03, 316.171; and, according to the MUTCD, it is up to the appropriate regulatory agency to determine the need and selection of such devices, MUTCD § 8A.01. Section 335.141 provides, in that regard, for the development of a systemic and systematic

---

**5.** The remainder of 23 U.S.C. § 103(d) provides that "[a]t a minimum, such a schedule shall provide signs for all railway-highway crossings."

**6.** Before its repeal, Florida Reg. 14–46.002 provided that cost allocations under the Section 335.141 program were governed by the FHA Federal–Aid Highway Program Manual ("FHMP"), Volume 1, Chapter 4, Section 3 *and subsequent revisions. Id.* at (2) (emphasis added). On December 9, 1991, FHWA Order H 1321.1A canceled the FHMP and replaced it with the Federal–Aid Policy Guide ("FHPG"). *See http://www.fhwa.dot.gov/legs-regs/directives/fapg/1trans01.htm.* The FHPG, Subchapter B, Part 140, Subpart I provides a guide to reimbursement for railroad work on projects undertaken pursuant to the provisions of 23 C.F.R. part 646, subpart B. FHPG § 140.900. 23 C.F.R. part 646, subpart B, in turn, prescribes policies and procedures for advancing Federal-aid projects involving railroad facilities, including the elimination of hazards of railroad/highway grade crossings

pursuant to 23 U.S.C. § 130. 23 C.F.R. § 646.200. Although Florida Reg. 14–46.002 was repealed in 2003, it was replaced by Florida Reg. 14–57.01, which specifically provides for cost allocations according to FHPG, Subchapter B, Part 140, Subpart I. FLA. ADMIN. CODE r. 14–57.001(2) (2003).

**7.** This document is an easement agreement between CSX's predecessor entity, Seaboard Coast Line Railroad, Inc., and Orange County, Florida. Although, based on naming issues, the Liboy Estate expresses some doubt as to whether the Easement relates to the Glen Rose Crossing, the Estate has not raised a material issue of fact in that regard. The Easement, dated April 8, 1970, describes the railroad crossing in relation to Nela Avenue. Today, Nela Avenue extends east from Orange Avenue (S.R.527), and Glen Rose Avenue extends west from the same Orange Avenue intersection. Glen Rose Avenue is a subsequent (or subsequently renamed) road extension.

program, Fla. Stat. § 335.141(2)(a); *see* 23 U.S.C. § 103(d); and Section 335.141 now provides that "the [Florida Department of Transportation] and the railroad companies are not liable for any act or omission in the development of such program or for the priority given to any crossing improvement," Fla. Stat. § 335.141(2)(a); 1986 Fla. Laws ch. 86–243, § 27.

*Smith* does not account for these developments; it relied on a series of earlier state-court cases as ground to permit a jury to decide whether a railroad should have installed additional warning devices at a railroad crossing. *Smith*, 805 F.Supp. at 38–39 (citing, among others, *Seaboard Coast Line R.R. Co. v. Louallen*, 479 So.2d 781 (Fla. 2nd DCA 1985); *Department of Transp. v. Webb*, 409 So.2d 1061 (Fla. 1st DCA 1981); *Seaboard Coast Line R.R. Co. v. Buchman*, 358 So.2d 836 (Fla. 2d DCA 1978)). *Louallen*, for one, relied on Section 351.30 (1979) as evidence that Florida "obviously contemplated" instances were a railroad would install more that just the minimum warnings required by statute.[8] *Louallen*, 479 So.2d at 783. Section 351.30, however, was repealed in 1982. *See* 1982 Fla. Laws ch. 82–90, § 12. *Webb*, in addition, denied a county's claim of immunity from an inadequate-warning-devices claim, finding that the planning required to implement such warnings did not trigger sovereign immunity. *Webb*, 409 So.2d at 1064. Section 335.141, however, was amended in 1986 to provide immunity both to the government and railroads, per-

haps in response to *Webb*. 1986 Fla. Laws ch. 86–243, § 27. Finally, *Buchman* held that, if a railroad crossing presented unusual hazards, a railroad may be held negligent for failing to install warning devices beyond the minimum required by statute. *Buchman*, 358 So.2d at 839. *Buchman*, in this regard, distinguished the Florida Supreme Court's decision in *Atlantic Coast Line Ry. Co. v. Wallace*, 61 Fla. 93, 54 So. 893, 895 (1911), which held that it is a legislative or administrative function, not a question for a jury, to determine the facilities essential or useful for preventing injuries at railroad crossings. *Buchman*, 358 So.2d at 839–40. By comparison, Florida's current statutory framework, along with its reliance on the MUTCD, is more consistent with *Wallace*, and reveals that *Louallen*, *Webb*, *Buchman*, and (accordingly) *Smith* no longer represent the law of Florida. *See* Fla. Stat. §§ 351.03, 316.171, 335.141.

Ultimately, any claim the Liboy Estate may raise concerning the need for additional warning devices would run afoul of Section 335.141's immunity provision. *See* Fla. Stat. 335.141(2)(a). The claim would operate on the assumption that the Glen Rose Crossing was not properly considered in the program to reduce hazards at public railroad-highway grade crossings or that additional warning devices were not installed in time. CSX is immune from such claims, as they necessarily depend on acts or omissions in the development of the program or on the (ostensibly low) priority given to improving the Glen Rose Crossing.[9] *See id.*

---

8. Section 351.30 provided, when stripped of certain signage and installation requirements, that:

> Whenever any railroad company has or may hereafter install at any grade crossing, signals of the automatic flashlight type which are approved by the Association of American Railroads and by the Federal Public Roads Administration ..., then and in any such event, so long as said automatic signals are maintained in force and effect, it

shall be unnecessary for the railroad companies to comply, and such railroad companies are herein and hereby relieved from the duty of complying with, ss. 316.171 and 351.03 relating to signboards and crossing signs.

Fla. Stat. 351.30 (1979).

9. The Liboy Estate also contends there was not a sufficient, unobstructed line of sight to allow a driver nearing the Glen Rose Crossing to see a train approaching in time to stop. If

## B. The Negligent–Operation Claims Against Amtrak, Taylor, and Smith

The Liboy Estate's negligent-operations claims raise the issue of what Amtrak, Taylor, and Smith could have done differently to avoid the collision or mitigate the resulting damage. In this regard, the Liboy Estate generally concedes that, according to *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), Amtrak cannot be held liable for operating the train at an excessive speed, if the train was traveling within the designated speed limit. The Rail Defendants, to that end, have introduced an affidavit indicating that the Glen Rose Crossing involves a Class–IV track, with a speed limit of 80 miles per hour. (Doc. 72, Attach. 1, at 1–2). The Liboy Estate has not presented any evidence to indicate otherwise. Accordingly, if a genuine issue of material fact exists, it relates to whether there is evidence that Amtrak could have prevented the collision or mitigated the resulting damage, given that the train was lawfully traveling at 75 miles per hour.

### 1. Failure–to–Stop Claim

■ The principal thrust of the Liboy Estate's failure-to-stop claim is that Roge-

ro's car was a specific, individualized hazard to which Amtrak had a duty to respond—presumably, by engaging the train's emergency brakes. In *Easterwood*, the Supreme Court expressly left open the issue of whether federal train-speed regulations preempt the "duty to slow or stop a train to avoid a specific, individual hazard." *Easterwood*, 507 U.S. at 675 n. 15, 113 S.Ct. 1732. The Eleventh Circuit has recently suggested that a specific, individual hazard must be something out of the ordinary. *See Wright v. CSX Transp. Inc.*, 375 F.3d 1252, 1259 (11th Cir.2004) (finding that a warehouse positioned next to railroad tracks is not "a unique, individual condition" and "there is no evidence that railroad cars parked near tracks are unusual"). Generally speaking, it seems valid to say that a specific, individual hazard, rather than being a generally dangerous railroad crossing, is a unique occurrence giving rise to an imminent threat of collision. *See, e.g., Hightower v. Kansas City S. Ry. Co.*, 70 P.3d 835, 848–49 (Okla.2003); *Bashir v. National R.R. Pass'r Corp.*, 929 F.Supp. 404, 412 (S.D.Fla.1996) (a child standing on the tracks). In this regard, the Liboy Estate's only evidence warranting more than a note is the store clerk's testimony that Rogero's car appeared to be stopped on the tracks.[10] (*See* Doc. 106,

the Liboy Estate intended to assert this as a separate negligence claim, it has utterly failed to present evidence of a sight obstruction over which CSX had control and, therefore, could be held liable. It appears, more likely, that the Liboy Estate has identified visual obstructions (*i.e.*, buildings) outside CSX's right of way as factors contributing to the need for additional warning devices at the Glen Rose Crossing. To that end, the Liboy Estate's claims are precluded under Florida law, as discussed above.

10. To the extent the Liboy Estate claims that the approach of Rogero's car to the Glen Rose Crossing constituted a specific, individualized hazard, the claim is meritless. Cars approaching railroad crossings is an everyday

occurrence. "Generally, a railroad is not liable for failure of its train to slow or stop simply because a pedestrian or a vehicle approaches the tracks ahead." *Florida E. Coast Ry. Co. v. Griffin*, 566 So.2d 1321, 1324 (Fla. 4th DCA 1990). Indeed, "[t]he railroad has a right to assume that one crossing its tracks will at least look to see if there is an approaching train, and if so, he will not plunge into its pathway." *Atlantic Coast Line Ry. Co. v. Timmons*, 160 Fla. 754, 36 So.2d 430, 431 (1948). Taylor recalls applying the train's emergency brake somewhere in the vicinity of impact, when he realized that Rogero's car was proceeding to go through the Glen Rose Crossing. (Doc. 98, Attach. 1, at 20–21; *id.*, Attach. 2, at 17). It is undisputed that, thereafter, the train carried Rogero's car 1670 ft

Attach. 5, at 9, 13, 23).

A careful analysis of the clerk's testimony indicates that she was not in a position accurately to perceive the movement of Rogero's car. From her vantage point, she could not later tell whether a car was stopped on or before the Glen Rose Crossing. (Id. at 9, 12). This is not surprising. Parallax is a well-known phenomenon whereby an object observed from different vantage points appears to have different positions. OXFORD ENGLISH REFERENCE DICTIONARY 1055 (2nd ed.1996). Unlike Taylor and Smith, for instance, the clerk was standing about 300 feet away and almost directly to the east (rear) of Rogero's car—a point from which it would be virtually impossible to perceive in a brief instance whether the car was moving. Even if the Court were to credit the minuscule possibility that the clerk's visual perception was accurate, she claims to have "looked up" at the scene almost exactly at the time of impact. (Doc. 106, Attach. 5, at 13). To make any difference, one would have to infer not only that the car was stopped on the tracks, but that it was stopped there for a period of time sufficient for Taylor or Smith to apply the train's emergency brakes and slow the train to a non-lethal speed. There is simply no evidence to support the latter inference. Accordingly, the clerk's testimony does not give rise to a material issue of fact as to whether Amtrak, Taylor, or Smith negligently failed to stop the train.

### 2. Claim for Failure to Sound Horn Appropriately

■ The Liboy Estate's claim that the train's horn was not sounded appropriately is on better footing. Florida Statute 351.03 provides in relevant part that "any railroad train approaching with 1,500 feet

of a public railroad-highway grade crossing shall emit a signal audible for such distance". FLA. STAT. 351.03(3). It is undisputed that the train's horn was first sounded at 812 feet from the Glen Rose Crossing. To be sure, the Liboy Estate's proffered expert has indicated that a horn sounding at 812 feet would not be a reasonably conspicuous warning, given that Rogero was distracted with the task of crossing an adjacent highway at the time. (Doc. 98, Attach. 4, at 4). The Rail Defendants cite this as evidence that sounding the horn at 1,500 would be ineffective. Nevertheless, that expert has also indicated that the train's horn had not sounded as Rogero started to cross the adjacent highway. (*Id.*) Whether the sounding of the train's horn at 1,500 would have alerted Rogero to the train's approach before he began to cross the adjacent highway is a question of fact for a jury to decide.

### C. The Punitive Damages Claims Against the Rail Defendants

■ Finally, the Liboy Estate claims that the Rail Defendants may be held liable for punitive damages. As discussed above, the only remaining claim upon which punitive damages could be based is the claim that Amtrak, Taylor, or Smith failed to sound the train's horn at 1,500 feet from the Glen Rose Crossing.

Florida law provides the following standard for punitive damages:

> The character of negligence necessary to sustain an award of punitive damages must be of a 'gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a con-

---

beyond the Glen Rose Crossing. (Doc. 98, Attach. 4, at 4). Under the alternative that Rogero's car did not stop, the Liboy Estate

has not designated any evidence capable of supporting a reasonable inference that Amtrak could have averted this fatal outcome.

scious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.'

*Owens–Corning Fiberglas Corp. v. Ballard,* 749 So.2d 483, 486 (Fla.1999) (quoting *White Constr. Co., Inc. v. Dupont,* 455 So.2d 1026, 1029 (Fla.1984)).

In the instant case, the Liboy Estate has not presented any evidence indicating that the failure to sound the train's horn at 1,500 feet from the crossing could possibly meet this standard. It is undisputed that the train and Rogero's car were not within view of one another at that point. The Glen Rose crossing was not frequently used, nor apparently was it a site of frequent danger. In the 27 years prior to the collision, only one other train-vehicle collision occurred at the Glen Rose Crossing, and there is no evidence the circumstances were comparable. (Doc. 98, Attach. 4, at 1–2). In short, the Liboy Estate has failed to present evidence to support a reasonable inference that Amtrak, Taylor, or Smith recklessly disregarded human life under the circumstances or by failing to sound (or require the sounding of) the train's horn at 1,500 feet from the Glen Rose Crossing.

## IV. CONCLUSION

Based on the foregoing analysis, it is hereby

**ORDERED** that the Rail Defendants' Motion for Summary Judgment (Doc. 72) is **GRANTED** in part and **DENIED** in part. All of the Liboy Estate's claims, save its claim that Amtrak, Taylor, and Smith failed appropriately to sound the train's horn, are **DISMISSED** with prejudice. Judgment, in this regard, will be withheld until the resolution of the remaining claim. The Liboy Estate's claim for punitive damages is stricken.