Freda LERNER and Hyman Lerner,
Individually and As Husband &
Wife, Plaintiffs,

v.

SEABOARD COAST LINE RAILROAD
COMPANY, Defendant.

No. 77 Civ. 4801 (CHT).

United States District Court,
S.D. New York.

Aug. 23, 1984.

Marvin Lechtman, New York City, for plaintiffs.

Jonathan L. Rosner, P.C., New York City, for defendant.

## OPINION

TENNEY, District Judge.

This is an action for personal injuries arising out of a railroad crossing accident at the McDuff Avenue grade crossing in Jacksonville, Florida in 1975. The collision at the crossing was between the Auto-Train, a train operated by the Auto-Train Corporation ("Auto-Train Corp."), and a car driven by Sara H. Thompson ("Thompson"). The plaintiffs, Freda and Hyman Lerner ("the Lerners") who are husband and wife, were passengers aboard the train. The train was being operated over tracks owned and maintained by defendant, Seaboard Coast Line Railroad Company ("Seaboard").

Jurisdiction is properly founded upon diversity of the citizenship of the parties. 28 U.S.C. § 1332 (1982). On January 4, 1984 the Court held a hearing on two motions. In one motion the defendant sought a pre-trial determination whether certain deposition testimony was admissible pursuant to Federal Rule of Evidence ("F.R.E.") 804.[1] By the other motion, the defendant sought an order pursuant to Federal Rule of Civil Procedure ("Rule") 56 granting the defendant summary judgment on the ground that there is no issue of material fact and Seaboard is entitled to judgment as a matter of law.

At the hearing defendant argued that the Court should admit into evidence the deposition testimony of the three train crew members—Engineer Jarrell, Brakeman Stapler and Fireman Keeling—and the deposition testimony of Thompson and two witnesses—Police Officer Jones ("Officer Jones") and Mr. William Osborne ("Osborne").[2] Three of the six individuals, Thompson, Keeling and Stapler, are now deceased. Their depositions were taken during the course of two prior actions which were commenced by passenger-plaintiffs in Florida state court. The depositions of the three other individuals, Jarrell, Officer Jones, and Osborne, were taken in

---

1. In the original motion papers the defendant also sought an order pursuant to Rule 37, precluding the plaintiffs from offering certain evidence for their failure to comply with discovery requests. Since the plaintiffs have complied with the requests this motion is deemed withdrawn.

2. Both Osborne and Officer Jones were nearby at the time of the accident; both heard the train whistle as it approached the McDuff Avenue crossing.

Florida by the parties to this action. During the course of the hearing in January the Court ruled that the deposition testimony of all six individuals was admissible. *See* discussion *infra*. In light of this ruling the Court reserved decision on the motion for summary judgment pending further review of the material submitted to the Court. Having reviewed this material, the Court grants summary judgment for the defendant.

## BACKGROUND

Plaintiffs here allege that they sustained injuries when the Auto-Train in which they were travelling stopped suddenly as its emergency brake was applied. While the nature of the injuries allegedly sustained is not clear from the record, plaintiffs state that when the train stopped they were thrown from their seats against various objects in the car of the train. From the materials submitted to the Court, which include the deposition testimony, exhibits, and photographs of the accident scene, the following facts emerge. On the morning of October 17, 1975 the Lerners were passengers aboard the Auto-Train, a train that carried passengers and cars from Lorton, Virginia to West Palm Beach, Florida. Auto-Train Corp. and the defendant, Seaboard, were parties to an Operating Agreement pursuant to which Seaboard provided equipment, crews and rights-of-way for the carriage-for-hire of passengers and automobiles for a period of years including the date of the accident.

At approximately 7:40 A.M. on the 17th, a train crew consisting of Engineer Jarrell, Brakeman Stapler and Fireman Keeling boarded the Auto-Train at the McQuade Street stop in Jacksonville, Florida and relieved the previous crew. Jarrell Deposition ("Dep.") at 6; Keeling Dep. at 7–10; Stapler Dep. at 5–6. With Engineer Jarrell in the right front seat of the lead engine, Brakeman Stapler in the left front seat, and Fireman Keeling in the seat immediately behind Stapler, the train left McQuade Street at a speed of approximately 15 miles per hour. Jarrell Dep. at 7–9; Keeling Dep. at 7–12; Stapler Dep. at 5–8. The day was clear and sunny. Jones Dep. at 31.

The distance between McQuade Street and the McDuff Avenue grade crossing, the site of the accident, is approximately one and one-half miles. The tracks are straight for approximately one mile before the McDuff Avenue crossing and traverse some six grade crossings. Jarrell Dep. at 7–9, 11–12, 20–21; Keeling Dep. at 10–12. After passing the first two or three grade crossings, the train's speed was increased from 15 to 25 miles per hour in accordance with the posted speed limits. Keeling Dep. at 9–12; Stapler Dep. at 8–9; Jarrell Dep. at 9–10. En route from McQuade Street to the McDuff Avenue grade crossing the crew was observing the tracks in front of the train, and Engineer Jarrell sounded the train's bell and horn for the three grade crossings before the McDuff Avenue grade crossing. Jarrell Dep. at 9–12; Stapler Dep. at 6–8, 11–12; Keeling Dep. at 21–22.

The McDuff Avenue grade crossing, which is depicted in the Appendix, can be described as follows. The avenue runs in a north/south direction. At the point it crosses the Seaboard right-of-way there is a double set of tracks running in a northeasterly and southwesterly direction. Directly south of the rail line, parallel to it, is Roosevelt Boulevard, a four-lane, divided arterial. Approximately 50 feet to the northeast of the McDuff Avenue crossing is another railroad crossing—the Post Street crossing. Post Street runs in an east/west direction and intersects with McDuff Avenue north of the rail lines. Approximately 1200 yards farther to the northeast from the crossing, an expressway overpass crosses the tracks. At the Post Street/McDuff Avenue intersection, Plymouth Avenue begins and runs southwesterly parallel to the rail lines on the north side.

At the time of the accident the McDuff Avenue grade crossing had railroad crossbuck signs with warning bells and flashing lights synchronized to warn traffic of approaching trains. Additionally, in the middle of McDuff Avenue, above the track, a

set of flashing lights were set up to alert traffic of approaching trains. The traffic control signals at the intersection of McDuff Avenue and Roosevelt Boulevard were synchronized with the other signals to control traffic and prevent it from turning onto the McDuff Avenue grade crossing. All of the signals were in place and were functioning properly on the morning of October 17, 1975. Jones Dep. at 6–7, 9–14, 17, 45–47, 49–50; Jarrell Dep. at 14–15; Osborne Dep. at 7–10; Stapler Dep. at 13–14.

According to Mr. Osborne, a nearby resident, an individual standing on McDuff Avenue at the grade crossing could look up the tracks and see a distance of approximately 1200 yards. Osborne Dep. at 8. Thompson stated that at the intersection of McDuff Avenue and Roosevelt Boulevard—the intersection immediately before the tracks, if one is driving north—an occupant of a vehicle could observe the tracks up to the expressway overpass and that no obstructions or trees interfered with a clear view of the tracks at the McDuff Avenue grade crossing. Thompson Dep. at 25–26. Officer Jones stated that "I would say the tracks are pretty clear." Jones Dep. at 40.

Brakeman Stapler testified that from the engine the McDuff Avenue grade crossing could be observed from the Edison Street grade crossing a substantial distance up the tracks, Stapler Dep. at 12, and that no visual obstructions exist at the McDuff Avenue grade crossing which interfere with visibility. Stapler Dep. at 14–15, 16, 28.

As the Auto-Train was approaching the McDuff Avenue grade crossing from the northeast on the morning of October 17, Engineer Jarrell was sounding the train's bell and horn for the three grade crossings before it, and he continued to sound the bell and horn for approximately 20 to 30 seconds before coming to the McDuff Avenue grade crossing. Jarrell Dep. at 9–10; Stapler Dep. at 28; Keeling Dep. at 21–22, 31; Jones Dep. at 7, 42, 49–50, 58–59; Osborne Dep. at 7–8, 10, 12.

At the same time the Auto-Train was approaching the McDuff Avenue crossing, Thompson, a 47-year-old elementary school teacher, was also heading toward the crossing. At Park Street in Jacksonville she turned onto McDuff Avenue and headed north toward her school. Having driven this way daily for approximately two months, she was familiar with the route and the McDuff Avenue crossing. Thompson Dep. at 5–10, 20, 23. Thompson drove her automobile, which was in good working condition, Thompson Dep. at 10, across Roosevelt Boulevard and stopped a safe distance from the railroad tracks to "honor" a red traffic light on the other side of the railroad tracks at the intersection of McDuff Avenue and Post Street. Thompson Dep. at 11.

As the Auto-Train proceeded southwesterly Engineer Jarrell, Brakeman Stapler, and Fireman Keeling observed the tracks in front of them, each keeping a careful lookout as the train approached the different grade crossings along the route. Stapler Dep. at 6–8, 11–12; Keeling Dep. at 15; Jarrell Dep. at 10–12. The train approached the McDuff Avenue crossing on the tracks closest to Roosevelt Boulevard. Brakeman Stapler, who had the best visibility of the Roosevelt Boulevard side of the tracks from his seat in the locomotive, Stapler Dep. at 6–8, saw Thompson's car approaching the crossing on McDuff Avenue. At this time the train was approximately 100 feet from the crossing. Thompson's car was halfway between Roosevelt Boulevard and the closest track. It was moving very slowly, perhaps ten miles per hour. Stapler Dep. at 17–20, 21, 29. Fireman Keeling who was sitting right behind Stapler also noticed Thompson's car moving slowly toward the tracks. Keeling Dep. at 20–23, 30, 36–38. Both Keeling and Stapler stated that they believed that the Thompson vehicle would come to a stop before going onto the tracks, and thus, neither told the engineer to beware or to stop. Stapler Dep. at 20; Keeling Dep. at 37. Stapler stated, "[S]he was going slow enough that I thought she was stopping. I thought she could have stopped any time she touched the brake." Stapler Dep. at

19–20. When Stapler "finally decided she wasn't going to stop ... [w]hen she got to where we would hit her ... I yelled at the engineer" to place the train into an emergency brake condition. Stapler Dep. at 19. *See also* Keeling Dep. at 22–23, 25–26; Jarrell Dep. at 13, 17–18. Engineer Jarrell immediately placed the train into "Big Hold" to stop it as quickly as possible. He stated that he "had a glimpse of [Thompson's car] before, before it was struck." *Id.* at 17. Both Keeling and Stapler stated that the train was within approximately 50 feet of the car when they realized that it was about to pull in front of the train. Stapler Dep. at 21; Keeling Dep. at 22–23, 25, 26. Stapler also stated that the Thompson vehicle came to a stop immediately before the train hit the car. Stapler Dep. at 28. After striking the car the train travelled approximately 350 feet. Jarrell Dep. at 14.

Thompson's deposition testimony basically corroborates the statements made by the train crew concerning her movements immediately before the collision. She stated that after having stopped a reasonable distance from the railroad tracks for the red traffic light at Post and McDuff, Thompson Dep. at 15, she began to move slowly forward toward the tracks when the light turned green. She stated that she did not recall hearing bells or whistles or seeing any flashing railroad warning lights. Nor did she recall looking up or down the tracks before proceeding. Thompson Dep. at 13–14, 28, 30. Thompson recalled that immediately before the collision she saw "something white coming at me. And I immediately applied my brakes." *Id.* at 13; *see also* 29–30.

■ The only apparent contradictory testimony to the above accounts of the accident came from Vivion Alvarez ("Alvarez"), a motorist who was near Thompson's car at the time of the accident.[3] During his deposition he stated that he saw Thompson's car sitting still on McDuff, jutting out onto the railroad right-of-way, for a "matter of seconds before the train hit her," perhaps "ten seconds." Alvarez Dep. at 16–17.

Officer Jones, who had been parked near the expressway overpass, arrived at the scene a few moments after the crash. He testified that Thompson stated to him that she had struck the train. Jones Dep. at 43. Officer Jones issued Thompson a traffic citation for failure to obey a traffic signal indicating the approach of a train. *Id.* at 16. Thompson pled guilty to this violation. *See* Exhibit 9 to Defendant's Notice of Motion for an Order Granting Summary Judgment.

Subsequent to the collision a number of actions were brought against Auto-Train Corp., Seaboard and Thompson in the Circuit Court of the Fourth Judicial Circuit in and for Duval County, Florida, by Auto-Train passengers. Included among these were actions entitled *Joseph Grabelsky v. Seaboard Coast Line Railroad Company, et al.*, Case No. 76–6615–CA, and *Stanley R. Zaleski, et al. v. Seaboard Coast Line Railroad Company, et al.*, Case No. 76–1800–CA. In each of these actions the plaintiffs were passengers on the train at the time of the crash. The plaintiffs sought damages from Auto-Train Corp., Seaboard and Thompson on theories of negligence, *inter alia*, that the signal and warning devices controlling vehicular traffic at the McDuff Avenue intersection were inadequate under the circumstances.

As part of these actions a number of depositions were taken by the plaintiffs' attorneys between September 14, 1976 and December 22, 1976. Included among these were the depositions of Thompson, Stapler, Keeling and Alvarez.

The instant action was commenced on September 30, 1977. Named as defendants were Thompson, Seaboard, and Auto-Train. The plaintiffs sought an aggregate amount

---

**3.** The plaintiffs did not move to have Alvarez' deposition admitted into evidence. Nor has a signed, certified copy of his deposition been supplied to the Court. The Court received an uncertified copy. Furthermore, there is no explanation why Alvarez could not have been deposed and cross-examined by the defendant in 1983. Thus, the deposition is inadmissible.

of $610,000 for injuries allegedly sustained when the train crashed into Thompson's vehicle at the McDuff Avenue railroad crossing. Seaboard filed a cross-claim against Thompson. On April 17, 1978 the Court dismissed the action as against defendant Auto-Train Corp. for lack of jurisdiction. Plaintiffs' appeal from that ruling was dismissed by the Court of Appeals for the Second Circuit on the ground that it did not constitute a final reviewable order. Sometime between 1979 and 1982 the plaintiffs settled with and discontinued their action as against Thompson. As for the defendant, Seaboard, the plaintiffs have continued to allege that it is liable to them for having failed to provide adequate, sufficient and operational warning and signal systems at the McDuff Avenue grade crossing.

Except for the settlement, the action remained dormant between October 1979 and March 1983. After the parties were informed by the Court that the action would be dismissed for failure to prosecute if the case did not become active, a status conference was held on June 28, 1983. At that time a discovery schedule was established. Following the conference documents were produced and witnesses were deposed in Florida and New York. On September 26, 1983 the depositions of Engineer Jarrell, Officer Jones, and William Osborne were taken in Jacksonville, Florida in the presence of plaintiffs' counsel. During the testimony of Officer Jones and Jarrell it was established that Thompson, Stapler and Keeling were all deceased. This was confirmed by certified copies of the death certificates which were submitted to the Court.

Subsequent to the taking of the depositions, the defendant moved for an order to determine whether the deposition testimony of the six individuals—Thompson, Stapler, Keeling, Osborne, Jarrell and Jones— was admissible in this action because, *inter alia,* the individuals were "unavailable" within the meaning of F.R.E. 804. The defendant at the same time moved for summary judgment under Rule 56. In January 1984, the Court held a hearing on the two motions. At the hearing and in his motion papers, the defendant argued that the deposition testimony of the three witnesses who had been deposed in Florida in 1983 was admissible because each deponent was beyond the process of the Court under Rule 45, and because their deposition testimony was taken in the presence of the plaintiffs' attorney, who had had an adequate opportunity to cross-examine the deponents. The plaintiffs' counsel at the hearing did not disagree, Hearing Transcript ("Tr.") at 7, and the depositions were ruled admissible.

As for the depositions of Thompson, Keeling, and Stapler, the defendant's counsel argued that these depositions should be admissible under F.R.E. 804(b)(1), (5). He further argued that, since the depositions were taken at the request of attorneys for plaintiffs in actions brought by passengers who were allegedly injured in the same train accident and who asserted the same theory of liability against the defendant as the current plaintiffs, the deposition testimony fell within the hearsay exceptions set out in F.R.E. 804(b)(1), (5). In response the plaintiffs argued that the testimony should not be admitted because they did not have an opportunity to cross-examine the three deceased witnesses, and because the deposition testimony of Jarrell, Officer Jones and Osborne is more probative of the events of that day than the testimony of Thompson and the two railroad employees.

Noting that the deceased individuals were literally on top of the accident and that they had been cross-examined by attorneys for plaintiffs who could be considered predecessors in interest to the present parties, within the meaning of F.R.E. 804(b)(1), the Court ruled that the deposition testimony of the three deceased individuals was admissible. Tr. at 13. *See also Clay v. Johns-Manville Sales Corp.,* 722 F.2d 1289 (6th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984); *Lloyd v. American Export Lines, Inc.,* 580 F.2d 1179 (3d Cir.), *cert. denied,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978). The Court reserved

decision on the summary judgment motion pending review of the deposition testimony along with the photographs and other exhibits that had been submitted in support of and in opposition to the motion.

## DISCUSSION

The second circuit has recently reminded the district courts that:

To grant summary judgment under Rule 56, a court must determine that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In doing so, the court "cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried." *Empire Electronics Co. v. United States,* 311 F.2d 175, 179 (2d Cir.1962) (emphasis in original); *United States v. Matheson,* 532 F.2d 809, 813 (2d Cir.), *cert. denied,* 429 U.S. 823 [97 S.Ct. 75, 50 L.Ed.2d 85] (1976); *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). The burden lies on the moving party to show, "on the basis of admissible evidence adduced from persons with personal knowledge of the facts, that there is no genuine issue of material fact," *Burtnieks v. New York,* 716 F.2d 982, 985 (2d Cir.1983); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 [90 S.Ct. 1598, 1608, 26 L.Ed.2d 142] (1970), and the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 [82 S.Ct. 993, 994, 8 L.Ed.2d 176] (1962) (per curiam); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

*Katz v. The Goodyear Tire and Rubber Co.,* 737 F.2d 238 at 244 (2d Cir.1984).

The circuit court, however, has also recently noted that:

Upon a defendant's motion for summary judgment supported by proof of facts entitling the movant to dismissal the plaintiff is required under Rule 56(e) to set forth specific facts showing that there is a general issue of material fact for trial or face dismissal. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33–35 (2d Cir.1978); *Gatling v. Atlantic Richfield Co.,* 577 F.2d 185, 187–88 (2d Cir.), *cert. denied,* 439 U.S. 861 [99 S.Ct. 181, 58 L.Ed.2d 169] (1978); *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981). If facts essential to support such opposition are not available, the plaintiff may obtain a continuance under Rule 56(f) to permit affidavits to be obtained or discovery to be had. He cannot rely simply on conclusory statements or on contentions that the affidavits in support of the motion are incredible. *Curl v. International Business Machines Corp.,* 517 F.2d 212, 214 (5th Cir.1975), (quoting *Rinieri v. Scanlon,* 254 F.Supp. 469, 474 (S.D.N.Y.1966), *cert. denied,* 425 U.S. 943 [96 S.Ct. 1683, 48 L.Ed.2d 187] (1976); *see Markowitz v. Republic National Bank,* 651 F.2d 825, 828 (2d Cir. 1981). An affidavit of the opposing party's attorney which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight. *See Gatling v. Atlantic Richfield Co., supra,* 577 F.2d at 188; *Schiess-Froriep Corp. v. S.S. Finnsailor,* 574 F.2d 123, 126 (2d Cir.1978).

*Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983).

Before determining whether a grant of summary judgment is appropriate in this case, the Court must first determine applicable Florida law regarding railroad crossing accidents.[4] In *Seaboard Coast Line R.R. Co. v. Buchman,* 358 So.2d 836 (Fla. Dist.Ct.App.1978), *rev'd on other grounds,* 381 So.2d 229 (Fla.1980), the court, after reviewing the pertinent cases, stated that:

From these and similar decisions, it appears that our courts have established a rule in railroad cases that where obstructed crossings in congested areas are involved, it may not be enough for the

---

4. There is no question that a New York court would apply the law of Florida in this case. *See*

*O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 846–50 (2d Cir.1984).

railroad to protect its crossing with the standard crossbuck, to operate its train within the speed limit, and to blow the whistle and ring the bell. The jury is still permitted to determine whether the railroad exercised reasonable care and caution under the circumstances and conditions existing at the time of the accident. *A directed verdict would only be appropriate in those cases in which there is no evidence of any specific acts of negligence and there is no evidence that the crossing is especially dangerous.*

358 So.2d at 839–40 (emphasis added).

■ In light of this standard, the plaintiffs present two arguments against the granting of summary judgment. First, they argue that "[i]f Engineer Jarrell had looked and paid attention to what was in front of him for a distance of a mile, he would have seen the grave situation ahead, slowed down and stopped, averting inevitable catastrophy." Answering Affidavit to Defendant's Notice of Motion: For an Order of Preclusion (R. 37 F.R.Civ.P.); For an Order Pretrial Determining the Admissibility of Deposition Testimony (R. 804 F.R.E.) ("Plaintiffs' Answering Aff."), at 7. The plaintiffs thus imply that Thompson's car was stopped on the right-of-way for a considerable period of time, that the engineer could have seen this a mile from the crossing and that he was negligent because he did not keep an adequate lookout. They assert that if Engineer Jarrell had been watching the tracks he would have been able to see Thompson's car and would have been able to bring the train to a safe stop.

This argument is meritless. All the admissible deposition testimony before the Court, including Thompson's testimony, indicates that she pulled her car onto the railroad right-of-way at the last moment before the crash, and that even if she had been stopped for a few seconds, the engineer would not have been able to avoid the sudden stop by emergency brake or to halt the train in time to avert the collision. The ambiguous testimony of Alvarez—that Thompson may have been stopped on the

railroad right-of-way for a few seconds, perhaps up to 10 seconds—even if it were admissible, does not, in light of the testimony of Thompson and the train crew create a material issue of fact that would justify submitting the question of the train crew's negligence to a jury.

In 43 Florida Jurisprudence 2d § 128 at 453–54 (1983) it is stated that

The operators of a railroad locomotive approaching a highway crossing have the right to presume that the driver of a motor vehicle approaching the crossing is in possession of his faculties and will keep off the tracks when a train is approaching in close proximity to the crossing. So also, *an engineer in charge of a locomotive of a train has the right to presume that an automobile crossing the railroad track a quarter of a mile ahead of his train will be over in ample time before his train reaches the crossing,* and he is not called on to presume that the automobile will break down and stop on the track. In such cases, it is not the duty of those on the locomotive to slow down or stop, *unless and until they see and realize that the driver of the vehicle cannot or will not keep off the tracks in front of the locomotive and avoid the danger of collision with it.* And in the latter case the railroad operators are not negligent where they do all in their power to avoid the collision with the automobile, but are unable to do so.

(Emphasis added) (footnotes omitted). *See also id.* at §§ 126–128. And in § 139 it is stated that

a person who approaches a railroad crossing in an automobile at a point where an approaching train may be seen at a great distance, fails to wait for its passing, and drives his automobile slowly on the track in front of the approaching train does not exercise reasonable precaution for his own safety.

*Id.* at 466 (footnote omitted).

In this case it is clear beyond dispute that the train crew did not or could not know that the car would pull onto the

track. All the admissible evidence before the Court demonstrates that the train crew complied with the statutorily mandated warning signals, that they kept a vigilant outlook as the train approached the McDuff Avenue crossing, and that they did everything possible to stop the train before the collision. Further, plaintiffs have failed to raise a genuine issue of fact regarding the propriety of employing the emergency brake under the circumstances, whether or not Thompson's car had been visible on the track for a few seconds before the collision. Thus, the evidence before the Court establishes that the railroad was not negligent in the operation of the Auto-Train even if Thompson's vehicle was on the track for up to 10 seconds. If there was any negligence here, it was on the part of Thompson with whom plaintiffs have already reached a settlement. Thus, plaintiffs' first argument against summary judgment must fail.

█ Plaintiffs' other argument is directed at the second prong of the standard set out in *Buchman, supra.* They argue that a determination whether the McDuff Avenue crossing was especially dangerous or hazardous is a material question of fact for the jury. The Court does not agree. While some states leave the determination whether an intersection is extrahazardous or especially dangerous to the jury, *see, e.g., Richards v. Southern Pac. Transp.,* 666 F.2d 99 (5th Cir.1982) (Texas law), Florida appears to be among those states that hold that this initial determination is a question for the court. *See Seaboard Coast Line R.R. Co. v. Griffis,* 381 So.2d 1063, 1065, *cert. denied,* 376 So.2d 72 (Fla.

1979) ("When there is no evidence that the crossing is extra hazardous, nothing more than the warning devices required by statute must be provided."); *Lindsey v. Seaboard Coast Line R.R. Co.,* 248 So.2d 518 (Fla.Dist.Ct.App.1971) (summary judgment for railroad in railroad crossing case). *See also Adamson v. Midland Valley R.R. Co.,* 384 F.2d 341 (10th Cir.1967) (Kansas law). Under Florida law, if the court determines that the evidence supports the conclusion that the crossing was especially dangerous, then the jury must decide whether the railroad's safety precautions were sufficient under the circumstances. *See Seaboard Coast Line R.R. Co. v. Buchman, supra,* 358 So.2d at 840 ("[W]hether the railroad should have provided additional crossing protection [in light of evidence that crossing was hazardous] became a jury issue ....."). *See generally* 43 Fla.Jur.2d §§ 114–125. Thus, some admissible evidence, submitted either by the defendant or the plaintiff, must show that the McDuff Avenue crossing was especially dangerous or hazardous if the summary judgment motion is to be defeated.

In support of their position that the intersection was especially dangerous, the plaintiffs rely on a number of documents that were submitted to the Court as exhibits to their motion papers. Plaintiffs principally rely on Florida Statutes § 338.21 (1972) (hereinafter "§ 338.21") which has been set out in the margin.[5] Plaintiffs assert that the erection of "flashing lights and gates at the McDuff Roosevelt Highway Grade Crossing on October 17, 1975, [was] mandated by Florida Statute (338.21 FS)

---

5. Section 338.21 provides in pertinent part:

Elimination of railway-highway crossing hazards

(1) The Department of Transportation, in cooperation with the several railroad companies operating in the state, shall determine and adopt a program for the expenditure of moneys now available, and of the moneys to become available, for the construction cost of projects for the elimination of hazards of railway-highway crossings.

(2) Every railroad company maintaining a railway-highway crossing shall upon reasonable demand and notice from the department,

install, maintain, and operate at such crossing an automatic flashing-light signal and ringing bell, the design of which shall be approved by the department, so that it will give to the users of such road reasonable warning of the approach of trains or cars on the tracks of such railroad company, the cost of such signals and the expense of installation to be paid from the moneys described in subsection (1).

(3) The department shall have regulatory authority over all public railroad crossings in the state, including the authority to issue permits for the opening and closing of such crossings.

(1972)." Plaintiffs' Statement Of Material Facts As To Which It Is Contended There Are No Genuine Issues To Be Tried, at 1. This statute empowers the Florida State Department of Transportation ("the Department") to adopt a program for the construction of projects that would eliminate hazards at railway-highway crossings. The plaintiffs point out that under this statute the Department and Seaboard entered into an agreement in December 1971 which provided for the installation of automatic grade crossing gate signals and other protective devices at various railroad crossings. The plaintiffs also point out that the program was being financed by the Federal Highway Administration, pursuant to federal legislation that called for the installation of safety devices at railroad crossings. *See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment Dismissing Plaintiffs' Action ("Plaintiffs' Memo. of Law"), at 7. Plaintiffs supplied the Court with a number of documents to substantiate the existence of the state program and the agreement between the state and Seaboard. Among the documents submitted is one that indicates that the McDuff Avenue Railroad crossing was one of the crossings scheduled to be supplied with automatic gates and flashing lights. Another document indicates that the crossing had a safety factor of 65 on a risk index scale of 0 to 90, with 0 indicating the most dangerous intersections and 90 the safest.

Plaintiffs argue that these documents and the scheduled installation of crossing gates at the crossing demonstrate that the McDuff Avenue crossing was especially dangerous and that a jury should determine whether the railroad should have installed the gates sooner or, in the interim, supplied alternate safety measures, such as flagmen.

The plaintiffs' argument is flawed in a number of respects. First, except for the Florida statute, § 338.21, none of the documents submitted to the Court are self-authenticating. *See, e.g.,* Rule 44; F.R.E. 1005. Therefore, because a proper foundation has not been laid for their admission, they may not be considered. *See* 6 J. Moore, J. Wicker & J. Lucas, Moore's Federal Practice ¶ 56.22[1] at 56–1326 (2d ed. 1982). But, even if these documents were admissible, nothing in them indicates that the McDuff Avenue crossing was especially dangerous. The documents apparently include only one specific reference to the safety features of the McDuff Avenue crossing, that is, the designation of 65 on the risk index scale.[6] However, there is no evidence in the record that indicates that the Department, Seaboard, or anyone else for that matter, considered intersections with a designation of 65 as especially dangerous or hazardous.

Second, contrary to the plaintiffs' contention, at the time of the accident Seaboard was in compliance with § 338.21(2). That section provides that railroads shall operate "an automatic flashing-light signal and ringing bell" at designated railway-highway crossings. *See supra* note 5. The evidence before the Court also demonstrates that Seaboard was in compliance with another railroad safety provision, § 351.03, which has been set out in the margin.[7]

---

6. In fact, the computer printout that lists the locations with their risk index factors makes no specific reference to McDuff Avenue, but rather lists Post Street, the other rail crossing in the McDuff Avenue vicinity. Plaintiffs, with no documentary support, assert that the Post Street and McDuff Avenue crossings are one and the same or at least should be treated that way.

7. Section 351.03 provides in relevant part:

Grade crossing warning signs and signals; exercise of reasonable care; blocking highways, roads, and streets during darkness

(1) Every railroad company shall exercise reasonable care for the safety of motorists whenever its track crosses a highway and shall put up large signboards at or near the crossing with the following inscription in large letters on both sides of the boards: LOOK OUT FOR THE CARS! This requirement for posting signs shall not apply to railroad crossings having signs as required by s. 316.171. In any incorporated city or town, every railroad company shall cause the bell on the engine to be rung before crossing any of the streets of the city or town .... All

■ The plaintiffs also argue that the railroad knew that the McDuff Avenue crossing was especially dangerous because a previous accident took place at the crossing on March 31, 1975. Plaintiffs' Memo. of Law at 8. The only evidence concerning this accident that the Court has received, besides plaintiffs' counsel's verbal references to it, *see id.;* Tr. at 26–27, was a copy of the Florida Traffic Accident Report. This report, which was not authenticated, was handed to the Court on the day of the hearing. While the accident report indicates that an automobile-train collision occurred at the crossing on March 31, no specific facts concerning the accident were set forth in either a deposition or an affidavit. *See Wyler, supra,* 725 F.2d at 160. Under Florida law evidence of prior accidents at the same location may be used to show that an intersection is especially dangerous or hazardous; however, in order for this information to be considered, the plaintiff must make some showing that the accident occurred under substantially similar circumstances and conditions. *See Reinhart v. Seaboard Coast Line R.R. Co.,* 422 So.2d 41, 44 (Fla.Dist.Ct.App.1982); *Perret v. Seaboard Coast Line R.R. Co.,* 299 So.2d 590 (Fla.1974). No such showing has been made to the Court. Nor did the plaintiffs, in response to the Court's query, request additional time to supply the Court with depositions or affidavits containing this information. Tr. at 26–28; *see also Wyler, supra,* 725 F.2d at 160; Rule 56(f). Accordingly, the Court may not rely on the report as evidence that the McDuff Avenue crossing was especially dangerous or hazardous.

■ Finally, plaintiffs imply that the crossing was dangerous because Officer Jones indicated on the accident report that "Yes, Need railroad crossing arms." This was in response to a question on the report that asked "Is engineering study needed? (If so, explain)." Officer Jones' notation, however, is not admissible evidence from which the inference can be drawn that the intersection was especially dangerous or hazardous.[8] Officer Jones was not offered as an expert on railroad crossings. *See, e.g., Buchman, supra,* 381 So.2d 229. Thus, if this statement is construed to be his opinion that the crossing was especially hazardous, it is inadmissible. *See* F.R.E. 803(8); *Weinstein, supra,* ¶ 803(8)[03] at 803–201 n. 5. But, the statement on the traffic report appears not to be a recommendation for post-accident remedial measures but rather an explanation of the issue the study should address, i.e., a railroad crossing problem.

In light of the above admissible evidence, the Court finds that Seaboard has demonstrated that there is no evidence of any specific acts of negligence on the part of the railroad and that there is no evidence in the record demonstrating that the McDuff Avenue crossing was especially dangerous or hazardous. In fact nothing in the record indicates that there is anything unusual or hazardous about the McDuff crossing insofar as traffic patterns and signals are concerned. *See, e.g.,* Stapler Dep. at 21. The plaintiffs, for their part, have failed to set forth specific facts demonstrating that a "general issue of material fact exists for trial." *Wyler, supra,* 725 F.2d at 160. The plaintiffs have failed to produce any evidence that indicates that the railroad was operating the Auto-Train negligently. More important for the purposes of this motion, they have failed to provide the Court with any admissible evidence that would indicate that the McDuff Avenue intersection is an obstructed crossing in a congested area or that it was subject to

motorists approaching a railroad crossing shall exercise reasonable care for their own safety and that of their passengers and for the safety of railroad train crews operating trains across such crossings.

8. During Officer Jones' deposition, plaintiffs did not ask him to interpret this statement. Jones Dep. at 27. As for his observations about the nature of the McDuff Avenue crossing he stated: "that particular intersection is so wide open, there are no buildings or obstructions there, that even approaching that intersection from— going from south to north, you still have a pretty clear view of the whole intersection." *Id.* at 41.

any other problems that would make it an especially dangerous or hazardous crossing.

■■■ While summary judgment in a negligence action is not usually appropriate, this is a case where it is. The uncontested evidence demonstrates that defendant Seaboard's train crew was complying with its statutory duty to give warning signals as the Auto-Train approached the McDuff Avenue crossing, *see supra* note 7, and that the statutorily mandated warning signals at the crossing were operational as the train approached. *See supra* note 5. The crew members who observed Thompson's car approaching the intersection had the right to assume that she would stop before reaching the tracks, and they were under no obligation to slow the train or to bring it to a stop. *See* 43 Fla.Jur.2d §§ 114–125. Thompson had a duty to stop, look and listen at the crossing. *See Myers v. Atlantic Coast Line R.R. Co.*, 86 So.2d 792, 796 (Fla.1956). Thompson was aware of the signal devices at the crossing, Thompson Dep. at 9–10, 13–14, 27–28, but had no recollection of observing the flash-ing lights or hearing the bells on the crossbucks or the whistle on the train.

■■■ Where a driver fails to obey her duty and is the sole proximate cause of a railroad crossing accident, the railroad will not be held liable to its passengers. *See Lindsey v. Seaboard Coastline R.R. Co.*, *supra*, 248 So.2d at 520 (summary judgment for railroad where, *inter alia*, evidence demonstrated clear unobstructed intersection with traditional crossbuck signs); *Myers v. Atlantic Coast Line R.R. Co.*, *supra*, 86 So.2d at 796 ("The crossing was not in the congested part of the city but was in the suburbs where the slightest caution would have averted the accident."). All the admissible evidence before the Court, including the deposition testimony, exhibits, and photographs, demonstrates that the slightest bit of caution on the part of Thompson would have avoided the accident and that she was the sole proximate cause of the accident. Accordingly, the defendant's motion for summary judgment is granted.

So ordered.

APPENDIX

Defendant's Exh. 5-A for Identification,
from Jarrell Dep.